Ford, J.
I protest against the application of the ordinary rules for the postponement of civil causes to these high crimes. It is of great importance to the state and to society that the punishment should follow crime as speedily as possible. We cannot submit to the idea, that in cases of this *267 nature a prisoner cannot be tried at the first term, merely because some of his witnesses may happen to bo absent. There is a just reluctance on the part of this court to postpone this cause, and were there no other grounds laid for the postponement except the absence of the witnesses we should order on the cause. There ought to be some disclosure made of the facts which are expected to bo proved by these witnesses, that the court may judge of their materiality before they would listen to an application of this kind'* As to the witness who resides in Pennsylvania, (John Zellers,) he is a relation of the defendant, and if his staying away will put off the cause, it may always be kept off.
But the great and leading reason which operates upon the court, is the lamented death of Mr. Bound, the prisoner’s *attorney, so receutly before the sitting of the court as to render it almost impossible to supply his place. The ■defence of every cause must depend much upon the preparation and proper arrangement of the testimony which is to be brought forward in support of it, as this part of the prisoner’s defence was intrusted solely to Mr. Bonnel, of whose assistance he has been so recently deprived by the hand of Providence; we are induced, not from any levity of feeling, but from a sincere belief that justice to the prisoner demands it to say, that the cause be postponed until the next term.
Cause adjourned.
*268 Thereupon Vroom, on the part of the defendant, applied to the court for permission to call his witnesses and bind them in recognizance to appear at the next term and give evidence, which was granted; the court observing, that as the object of the state was to do justice, and to give the prisoner a full and fair opportunity of investigating his cause.and manifesting his innocence, it was right that he should have the same means allowed him of enforcing the attendance of his witnesses, as was allowed upon the part of the state.
May Oyer and Terminer, 1824.-
Present — Andrew Kirkpatrick, JEsq., Chief Justice, John Thompson, Dennis Wykoff, George Rea, and others, Justices.
The prisoner being brought to the bar, and the jury called, the prisoner challenged peremptorily twenty of the jurors.
Vroom, of counsel with the defendant, asked one of the jurors, if he had not made up and expressed an opinion as to the guilt of the prisoner ?
Kirkpatrick, O. J.
You cannot ask that question. If' you mean to make a challenge you must do it in regular form, and then prove it in regular form; our books know of no other way. What a man says, not under oath, cannot be received in any form.
Wall. Do we understand it to be the opinion of the court, that we cannot interrogate the juror as to his having formed an opinion ? it has been repeatedly done.
*Kirkpatrick, C. J.
It is true we have slipped into the practice, but on looking into it I.am satisfied it is not the true way; the only proper way is, to make the challenge, and then prove it upon oath.*
*269 *Wall. We would, with the permissiou of your honors, call the defendants, and have seats provided, for them near the bar, that there may be no delay in bringing them forward when necessary.
*270 Kirkpatrick, C. J.
It is not the rule, that seats should be provided for the defendant’s witnesses, that they may hear the witnesses on the part of the state. The strict rule is, that they should be out of court.
Wall. I know of no rule to that effect.
*271 *Ej.rk Patrick, O. J.
We have often made rules to that effect, to prevent their hearing what the other witnesses detail in their evidence, for the less a witness hears of another’s testimony the more likely is he to declare his own knowledge simply and unbiassed.
*272 * W. JLalsted, attorney for the state, opened the indictment on the part of the state. 1. Pie lamented the disagreeable task which had been imposed upon him, but assured the jury he should endeavor to perform it in a *273 candid and conscientious manner. *2. He adverted to the highly interesting and responsible duties of the jurors, considered in relation to the community, and to the unfortunate prisoner at the bar, and exhorted them to dis *274 charge their duty firmly, uninfluenced either by a sense of indignation for the crime on the one hand, or of pity for the prisoner on the other. 3. 'He depicted the enormity of *275 the crime in a moral view, and its fatal consequences to civil society. 4. He explained the nature of the crime, as understood and defined in our law books. 5. He briefly stated the facts connected with the unfortunate transaction which he intended to prove. 6. He read the indictment.
William Hoffman was then produced as a witness on the part of the state, who sworo, that ho lived with Flommerfelt (the deceased) at the time of his death; that early in the morning of the 14th of May, 1823, Flommerfelt came to the barn where witness was working, and told him that Zellers had gone up to the field with his gun, and that witness must go with him and try to get the gun away from him; witness went with the deceased; when they came opposite to where Zellers was, they stopped in the road, and Flommerfelt said to Zellers, “ good morning, ZellersZellers replied, “ good morningFlommerfelt then asked Zellers what lie was making fence upon his possession for • Zellers said it was his own, and told him if he came on it he would shoot him ; Zellers then cocked his gun, and as Flormerfelt was going towards him with a very quick step, setting one foot over the fence, which separated the road from the field where Zellers was, the gun was discharged; Flommerfelt sagged down, with his right hand on his right knee, and, pitching forward, seized the gun with his left, and held it a short time; witness asked him if he was hurt, and he said he was ; Flommerfelt let loose of the muzzle of the gun and wheeled about on his left, holding his right hand upon his right knee, and very much bent, and got over the fence, and then fell down on the bank of the road • witness then caught Zellers, and cried murder as hard as he could; while he was holding Zellers, he told his boy to take a stick and knock witness’ brains out; the boy came towards witness with a stick, but did not strike him; then David Neighbour, William Johnson and David Neighbour’s *276 brother came to him, and the rest of David Neighbour’s *bands; they then tied Zellers with a rope, which witness saw Elommerfelt have in his pocket.
The witness, being cross-examined on the part of the defendant, said, when he started from the barn it might have been near sunrise; witness had been at work in-the barn; Elommerfelt did not say that he wanted witness to assist him; the barn is pretty near in the direction between the house and the place where Zellers was at work, although the barn stands farther from the road than' the house; witness did not know that Elommerfelt got the rope at the barn ; he was frightened, and cannot tell exactly what kind of a rope it was; could not state where Flora merfelt got the rope from; saw the rope in his pocket, the end of the rope hung out; saw Flommerfelt have a rope with him on the Saturday before; Zellers’ wife and his girls were in the field on the Saturday before, when Elommerfelt went up to the field to them, witness went with him; Elommerfelt did not tell witness what was his object in taking the rope on Saturday; he made no use of it that witness saw; the women were making fence, and Elommerfelt ordered them away; did not pursue them; he catched hold of the old woman and ordered her out of the field, and she fell right down, and then he took hold of her arm and pulled her over the rails which lay on the ground, and took her out into the road, and left her in the wagon track.
■Scott, on the part of the state, objected, that this testimony was not properly a cross-examination, but was merely new affirmative and substantive matter, and that the defendant ought not to inquire into it without opening it.
Vroom. We have a right, upon the cross-examination, •to examine into any facts to disprove the opening made by state’s attorney.
*277 Kirkpatrick, O. J.
Even upon a cross-examination, if you examine into a substantive independent matter, you must open it; and the opening of the attorney on the part of the state cannot alter it.
Vroom. We intend to prove that the defendant was in possession, and the evidence is offered to make out that fact; and further, it is offered to shew that Flommerfelt treated the wife and daughters of Zellers in a cruel and brutal manner, in order *to shew the state of irritated feeling and provocation under which the defendant acted.
Scott objected as to that part which relates to the possession, because no man had a right to defend his property (other than his house) by making use of a deadly weapon (4 Mass. Rep. 396); and as to his treating the wife in a brutal and barbarous manner on Saturday, it could not extenuate the act committed on the subsequent Wednesday.
Vroom. We have a right to shew in what manner he sought to obtain the possession. The transaction offered in evidence took place on Saturday, and the offence was committed on the Wednesday following; and that this old man was authorized to defend his possession by force, and to defend his person against a person whom he might believe (from the treatment his wife and daughters had received) was coming to do him some personal injury.
Kirkpatrich, G. J.
It can never bo set up, that the mere trespass can excuse him. No man can defend his property (other than his dwelling house) from a trespasser, by making use of a deadly weapon. But inasmuch as the ,distinction between murder and manslaughter depends upon the impulse of the mind with which the act was committed, every circumstance which goes to shew the feelings of the parties towards each other may be proper. That temper, *278 which at one time might not be excited, might, under the excitement of other circumstances, be more easily roused, and therefore it may be received by the jury, to shew the state of mind of the parties.
Examination proceeded.
Hoffman. Rather thinks Flommerfelt took hold of one of the girls; Flommerfelt did not chase her a considerable distance before he got hold of her; when the old woman was released, the girls were by her; Flommerfelt was in the field, and walked down part of the way after the old woman and girls; the old woman cried murder; witness does not know who carried the rails there to make the fence ; thinks the women folks must have done it; Flommerfelt said that the women were making fence; did not tell witness what he wanted witness to'go *with him to the field for; after he drove them out, witness came home; Flommerfelt did not drag the old woman as far as across this room; had no conversation with Flommerfelt why he took the rope at the time; Flommerfelt never made any use of the rope; he had it in his hand; he did not throw the rope over one of them, and pull her out with it; the rope looked like a line or halter; Flommerfelt got the rope going up to the field; when'the gun went off the witness was in the road, and Flommerfelt was right before him; there were two or three rails in the fence that Flommerfelt got over; when Flommerfelt began to advance with a quick step he was right on the bank near the fence; Zellers was five or six paces from the fence when he told him to stay off; Zellers stood still; after Flommerfelt was shot he pitched over the fence towards Zellers, and clapped his hand on his knee, sagged down, and advanced two or three steps with his hand on his knee; witness told David Neighbour of the rope being in Flommerfelt’s pocket; Flommerfelt made use of no-more force than was necessary to remove the old woman from the possession.
*279 David Neighbour, examined on the part of the state. I was in my house, that I had been building, at the distance of two hundred yards from the place where Flommerfelt was killed; shortly after sunrise, there was nothing to obstruct my view, I looked down the road, and saw Zellers, and some one with him, coming to the place where the affair happened; and immediately saw Flommerfelt standing about the middle of the road; stood long enough to exchange a word or two,, then saw Flommerfelt advance on a very quick step towards the fence which was between him and Zellers; about the time that Flommerfelt was by the fence, saw the smoke of the powder over him, and heard the report of the gun; saw Flommerfelt yet advance; then started to go down from the house, and, after he started, mot some of the workmen, and told them to go with him ; when arrived at the place, found Flommerfelt lying on the bank of the road side, with his face close to the ground; called to him, and he gave no answer; at this time William Hoffman was calling for assistance to help to secure Zellers; went to Hoffman and Zellers; Zellers was laying on the ground, and Hoffman had hold of him; Zellers clasped the gun in his arms; witness took it away from him; *Jesse Zellers took hold of the gun as if he wanted it; told him to let it alone; went to Zellers; somebody said there was a rope in Flommerfelt’s pocket; looked and saw the end hanging out; took it out and handed it to the person; Flommerfelt lived about three quarters of an hour from the time of the shot; it was an hour before the physician, Dr. Sherwood, arrived, and he was then dead; this transaction took place in the township of Lebanon, on the 14th of May, 1823 ; the rope was about five feet in length, similar to those which farmers make for halters, near half an inch in diameter.
Cross-examined by defendant’s counsel — said, he kept his eye steadily upon Flommerfelt from the time he saw him ; there was nothing to obstruct his view; thinks Benjamin Fritts was standing about ten feet to the east, or left of *280 him; has no recollection of seeing Flommerfelt advance more than one or two steps after he was shot; Fritts staid a little behind witness; witness was there first; Flommerfelt did not speak; he made some noise which he did not understand; Zellers was on the ground; heard Flommerfelt speak of'driving out of the field the old woman; but does not recollect being present when Flommerfelt came down to witness’ house on Saturday; did not examine to see whether there was any blood in the field; has a recollection that Flommerfelt sagged down after the gun went off, and that he appeared to be moving in the same direction.

Dr. Dbenezer K. Sherwood.

Was called on the 14th of May to visit Flommerfelt as a physician, and repaired to the house; when he came to the door he was dead ; he went to the room where he lay; looked at the wound ; the contents of the gun had gone into the thorax, between the third and fourth ribs; there did not appear to be a great deal of blood; it had ran down his clothes; did not examine the depth of the wound ; it was a ragged wound, the orifice was as large as a quarter of a dollar; it appeared as if the whole charge of the gun had lodged in his back; saw Zellers; he was in the chamber over the deceased, and found him there with his hands tied hy a rope to the rafters; as witness came into the chamber, he asked him what he had been about; he made no reply; witness then said, I think you have committed a crime which you are sorry for; he replied that he was not; asked him again whether it could be possible *that he was not sorry; he replied again, that he was not sorry, but if he was, it was but precious little; witness informed him, that from the appearance of the wound, that he calculated to kill him, and that he had shot him with a ball; he said he had not shot him with a ball; then, witness said, he must have shot with a bullet ; he said he had not; witness then asked him with what he *281 had shot him ; he said with common hunter’s shot; witness is not so positive, but rather thinks that he did say that he meant to kill him.
Cross-examined — the wound was on the left side ; when he first went up into the chamber where Zellers was, there was a young man sotting there; there was so much lamentation in the house that he thought it could not be in humanity not to be sorry for the act; Zellers said that he had shot him higher than he meant to shoot him, he said that Flommerfelt had hold of the gun when it went off; he did not say that he did not mean to kill.
Peter Sender shot, sworn on the part of the state — heard Zellers say, last April two years ago, at the time Flommerfelt was sowing clover seed on a piece of grain in the field which Zellers had given up to Flommerfelt, that if he did not stay off his possession he would go home and get his gun, and shoot his d — d soul out of his body; Zellers forbid Flommerfelt from sowing the grain, but Flommerfelt told him to go about his business, for he had given him leave to sow it once, and that was enough ; Zellers told Flommerfelt that he would not agree to what he had agreed before, and that he would not give up possession until the court decided it, and then he would; when Zellers said he would shoot Flommerfelt, he spoke in a passion ; Flommerfelt sent witness to Zellers to ask him if he might sow the grain, the morning before, and he said he might sow it, as it would not hurt the rye; witness worked with Flommerfelt at the time; Flommerfelt hauled rails off of Zellers’ land after Flommerfelt had purchased it at sheriff’s sale, but did not know whether Zellers had given up the possession of the woods to Flommerfelt at this time; Flommerfelt also made a frolic and hauled the wood; Zellers came and forbid them taking the wood out; Flommerfelt told them to go on, and he would bear them harmless, and ordered Zellers to go away — this was the fall of 1822, after the place *was *282 sold'; witness was ordered by Flommerfelt, in the summer after the ’sale of Zellers’ land, to drive the cows of the deceased over the river, by the door of Zellers; Zellers met him and ordered him back; he then went up to the son of the deceased, and told him if he did not go back he would knock his brains out; Flommerfelt then came up, and Zellers threw a stone at him; deceased then threw Zellers down and choaked him, and made him promise not to throw another stone at him; the land over the river, where they were driving the cattle, belonged part to Zellers and part to Flommerfelt, and was thrown open as a common ; pretty shortly after Flommerfelt came back from Flemington, he began to plough the buckwheat field; Zellers, forbid him, and Zellers went on to plough himself; then Flommerfelt commenced in another part of the field, and ploughed the whole of the field, except a little piece; then Zellers went and sowed it with buckwheat; Flommerfelt was killed in the field which he had ploughed; witness had a conversation with Zellers the morning' he killed Flommerfelt, and told him his word had come to pass; he said that it had.
John Anderson, examined on the part of the state, said— that on the morning of the transaction he came to the house of Flommerfelt; Flommerfelt was then laid out; that he went up to Zellers, and asked him how this misfortune happened-; he answered, that Flommerfelt came and got upon the gun, and I pulled, and he pulled, and she goes off; I asked the old man if he was not sorry ; he said he was not sorry, for now he lets me alone; there had been lawsuits before witness, in one of which he, Flommerfelt, had recovered judgment in the spring of 1822; Zellers was put in gaol by virtue of an execution issued upon that judgment, and witness understood that Zellers 'was released from gaol upon an agreement to give up the possession of two of the fields in dispute to Flommerfelt; it was upon one of the fields agreed to be given up that Flommerfelt wTas shot.
*283 Vroom asked the witness what the suit was brought for ?
Kirkpatrick, O. J.
Can we go into an investigation of all the legal proceedings between these parties ?
Vroom said, he wished to shew that the suit was unjust and malicious; and that while the prisoner was in gaol by virtue of *that judgment, and under duress, that he, in order to release himself from gaol, made the agreement to give up the two fields.
Kirkpatrick, C. J. You cannot go into the fact of proving that the suit was malicious; but may shew, that if there was any arrangement, it was while the party was in gaol and under duress of imprisonment.
Examination of Anderson proceeded. — Heard Flommerfelt say that he felt sorry for the old man, and that he had tried to compromise the thing; the amount of the judgment was paid by Zellers agreeing to give up the two fields spoken of.
John Lance, sworn, said he heard Zellers say that he was not sorry for what he had done; that Thomas Force had given him the gun, and told him to shoot Flommerfelt in the legs; witness was present when Peter Hendershot told Zellers, that he had now done what he had said (a year ago) he would do, he had shot Flommerfelt; Zellers replied yes; witness heard Flommerfelt say, that instead of $1,700, the amount he had paid for the place, he would make the sum $2,000, and pay that sum to Zellers if he would give up the possession, rather than send him to gaol; that witness communicated this to Zellers, but he said he could not do it till he saw particular persons.
William LI. Yauger, being sworn, said, that about July, 1822, he met Zellers with a gun in his hand, and asked him *284 if he was going a hunting; he answered he must shoot his way; witness told him not to shoot any person, and he said he would not — also said that he had borrowed the gun of Thomas Force.
Gabriel Hough, the gaoler, being sworn, said, that while Zellers was in gaol, Flommerfelt went into gaol to see him, and while there, some agreement was made, in pursuance of which Flommerfelt receipted the execution, and took Zellers out of gaol, and they went away together; the receipt was written in one of the outer apartments, and not within the gaol, John Filmly was present; Zellers was at the same time confined on a state’s warrant, from which he was discharged at the same time.
The counsel on behalf of the state then offered in evidence the sheriff’s deed to Flommerfelt for the property on which Flommerfelt was shot'.
*Kirkpatrick, C. J. said, that cannot be received, as we cannot inquire into the title in this suit.
The cause was then rested on the part of the state.
Clark opened the defence on the part of the prisoner, and, in the course of his opening, began to cite law to shew that the offeuce amounted only to excusable homicide, or, at most, to manslaughter, — when
Halsted objected, that the course which the opening counsel was pursuing was irregular, and observed, that counsel, in opening a cause had no right to read the law applicable to the case made out by their adversary, or to comment upon the facts which he had proved, but that he ought to confine himself strictly to opening his facts.
Kirkpatrick, O. J. That is undoubtedly the proper course.
*285 Benjamin Britts, being sworn on the part of the defendant, said, that on the Saturday before the deceased was shot he saw two of Zellers’ girls carrying rails towards the field where Flommerfelt was killed, and shortly afterwards he saw Flommerfelt and a man with him, and heard the cry of murder, and saw Flommerfelt chase the girls and catch one of them and lead her out of the field, and soon after saw the girls going down the road, and Flommerfelt in the field, walking after them; that on the day Flommerfelt was killed witness was on the scaffold at David Neighbour’s house soon after sunrise, and while there, he heard the report of a gun, and saw David Neighbour run down from the scaffold of the house and go to the place from whence the report proceeded, and witness followed after him; when witness got there Zellers was tied ; he saw some blood in the field, four paces from the fence. Witness further said, that he saw Flommerfelt fall, and that he was on the road side of the fence when he fell. Witness was one of the jurors on the coroner’s inquest; says that Hoffman was sworn before the coroner’s jury.
Scott objected to the defendant giving any parol testimony of what had been sworn before the coroner’s jury, as it had been reduced to writing by the coroner.
*The Chief Justice at first, thought the evidence admissible, but the counsel for the state cited 1 Oh. Or. L. 487, and Bev. Laws, 234; when the Chief Justice said, that he was not aware that a coroner was obliged to take down the evidence in writing; therefore let the evidence be overruled.
Vroom then offered to prove a conversation between the deceased and the witness (not in the presence of Zellers) in which the deceased said he meant to take the gun away from-Zellers, and turn him out of possession.
*286 Hoisted objected to this testimony as inadmissible, unless the'counsel of the defendant could prove that this conversation was communicated to Zellers before the act was committed ; and cited Fost. Cr. Law 315, and 1 Russell on Crimes 631-2.
Vroom # Wall contended that the evidence was admissible.
Scott was about to reply, when the Chief Justice said he need not answer; that the question was, what excited the prisoner to the commission of the act? Every thing that could operate upon his mind may be proved; but you cannot give in evidence conversation or acts of the ^deceased which never came to the knowledge of Zellers, for they could have no influence “upon his mind, and could neither justify or extenuate the crime.
William Fritts was then sworn on the part of the defendant, and testified, that Flommerfelt told him that when his little boy was driving the cattle, Zellers stopped him and threatened to stone him, and that he (Flommerfelt) went down and told Zellers if he wanted to stone any one, to stone him; Zellers then struck him with a stone, and that he (Flommerfelt) took hold of Zellers and threw him down, and held him until he promised he would not throw any more stones; that afterwards he got a state’s warrant, and had Zellers taken and putin gaol; Flommerfelt further said, that he was sorry the old man should lie in gaol, and wished witness would go down to Flemington and make a compromise ; he further said, that there were difficulties between them as to the possession, and that he did not know what to do with the old man; that he had agreed to give up the possession twice, but that when he (Flommerfelt) came to plough the field that Zellers interfered, and commenced ploughing *in the same place where his men were *287 ploughing, and that when he would tell his men to begin in another place Zellers would follow them; that Flommerfelt ploughed the whole field, except a very small piece, and after it was ploughed Zellers went with his gun, and sowed it with buckwheat. Witness further said, that Flommerfelt authorized him to tell Zellers that he would give him $200 if ho would give up possession. Witness advised Zellers to settle, or leave it to arbitrators, but Zellers would not do it. The character which Zellers bore was that of an ignorant and inoffensive old Dutchman.
Minará Farley, being sworn on the part of the defendant, said, that he had a conversation with Flommerfelt after he had returned home from the last May court, in which conversation Flommerfelt spoke of the skirmish he had with the old lady and two of Zellers’ girls; he said that they had gone up the road to make a fence to stop his fallow, and he asked the old lady what she did making fence upon his land ? and she replied, it was her land; that he then took the old woman by the arm and led her out into the road, and that one of the girls struck him with a stone; that he had a devil of a race to catch her, but that he did catch her and led her out of the field. Also Flommerfelt further said, that Henry Hellebrandt and Thomas Force were cursed rascals; that Force had let Zellers have the gun for the express purpose of shooting him, and that he would have the v?hole of them where the dogs would not bite them.
John Filmly, being sworn on the part of the defendant, said, that he was present at the agreement made between Zellers and Flommerfelt in the latter part of May or beginning of June, 1822; that witness went into the prison to see Zellers and to make the agreement for Flommerfelt, and that Zellers agreed that if Flommerfelt would let him out and cancel the execution that he would give up two of the fields until the"ejectment was determined; that Zellers *288 was released, and the execution cancelled in consequence of this agreement, and that Zellers and Elommerfelt went away from the gaol together, and the former appeared to be satisfied — one of the fields Elommerfelt was to have as a fallow field. Witness afterwards saw Zellers sowing one of these fields with buckwheat, and his wife standing in the field holding the gun. 0
* Ralph Beavers, being sworn on the part of the defendant, said, that he was at a frolic made by Elommerfelt in the fall of 1822, to haul wood from the property which Zellers claimed, -and that while they were hauling the wood, Zellers came and forbid them, and said that they were on his possessions; that Flommerfelt told them to go on and not mind the old man, that he would bear them harmless.
Jesse Zellers, the son of the defendant, was then sworn, and testified, that on the - morning that Flommerfelt was killed, his father told him to go up to the field and lay up fence; after he had been there a short time, his father came there with a gun; shortly after, Flommerfelt came down the road, and said, good morning, to his father — his father replied, good morning; Flommerfelt then asked his father whose gun he had, and his father said he had his own gun, and told Flommerfelt two or three times to stay off; witness was some distance from them, laying up rails,, and was not looking at his father when the gun went off, but as soon as he heard the report of the gun he- turned round and saw Flommerfelt with his right hand hold of the gun, and-his left hand hold of his father’s coat; his father, at this time, stood five or six paces inside of the field ; witness never heard Flommerfelt say anything about tying his father, or carrying him to gaol; witness loaded the gun himself, with common shot, to shoot pigeons four or five weeks before; his father never took the gun to the field *289 before, except when he sowed the buckwheat; witness had used the gun four or five weeks before — it goes off very easily, and sometimes when only half-cocked.
Joseph Beavers, being sworn upon the part of the defendant, said, he was upon the ground where the deceased was shot, three or four hours after the affair happened ; that he then discovered blood in the field, between three or four yards, or a little farther, from the fence ; there were three or four rails in the fence, which was about three feet high.
Henry Hildebrant, being sworn upon the part of the defendant, said, he knew that there had been disputes between Flommerfelt and Zellers about the possession ; witness had a conversation with Flommerfelt two or three months previous to his death, in which conversation Flommerfelt requested witness to *go to Zellers and try if he could not compromise their disputes; witness did go, and told Zellers that Flommerfelt had said he would give Zellers $200 more than Flommerfelt had paid at sheriff’s sale for the property, if he would give up the possession, and Mrs. Zellers would relinquish her right of dower, but the old man refused. About two years ago, shortly after Flommerfelt had purchased Zellers’ place at sheriff’s sale, witness told Zellers that he understood that Flommerfelt was a going to take him to gaol, but never understood that Flommerfelt was going to tie him, and never told Zellers that Flommerfelt said so.
Defendant’s counsel here rested their testimony.
Peter Guliek, constable, sworn on the part of the state. Witness heard Zellers say, when witness had taken him with a warrant, and was going to the justice, that Flommerfelt gave him trouble, and if deceased did not stay Off his land he would shoot him; witness then told Zellers that would be but poor satisfaction, and that they would hang *290 him; Zellers said .he did not care a damn, for he was old enough to die; Zellers was angry, at that time; never heard him make use of any such language when he was not angry; when witness took Zellers on an execution in favor of Elommerfelt, he was along the river making fence; found Lin-inger at the house of deceased, as they were going to the justice; witness took Zellers several times at the suit of Lininger and deceased; Zellers was as much provoked at Lininger as ah deceased; it was on a civil process under which witness, as a constable, took Zellers; witness thinks he had a state warrant against Zellers at the same time that he arrested him .under the warrant for debt; witness had a conversation with Elommerfelt the Saturday previous to his death,.but did not communicate it to Zellers; deceased had applied to witness to serve some state warrants upon Zellers and some of his family ; witness said that he would not do it; witness never said that Elommerfelt had never requested him to come and stay at his house on Tuesday night,' and to take the Zellers family to gaol the next morning.
Minard Farley, again called by defendant, ■ said, that Gulick told witness that Elommerfelt wished him to come and stay at his house on Tuesday night previous to .his death, and take the Zellers family before they were out of bed ; Giilick told *deceased that he would not risk his life any more about that house; Elommerfelt then said they would take them when they were in the field; Gulick then said that he would not go.
Joseph Johnson, Fsq., for defendant. Mrs. Zellers came to witness to swear her life against Flommerfelt; it was a very short time before the death of Elommerfelt; there were some bruises on her arms.
William Fritts, again called for defendant. Elommerfelt told witness to ask Zellers how much he would' take for his *291 land; Flommerfelt offered at that time $2200 and anew wagon for it, and Zellers asked $2500 for it; witness told Zellers that deceased had said .Lininger was cheating him, and that if he would come to him he would pay off his executions and buy the property ; witness' thinks that deceased offered a generous price for the property, considering the situation of Zellers; witness talked to Zellers about giving up possession, and advised him to do it, but he refused.
After the evidence was closed,
W. Moisted summed up the cause on the part of the state, and contended that the prisoner was guilty of murder. In the course of his argument, he cited the following authorities: Fost. Cr. Law 291, 296; 4 Mass. Rep. 396; 1 Hale 472, 486; 1 Russel on Crimes 631-2; 2 Chit. Cr. Law 486; 2 Ld. Ray. 1489; M’Nallys Fvi. 380; 1 Russel 640.
Vroom followed on behalf of the defendant, and contended — 1. That the prisoner did not intentionally fire off the gun, but that it went off accidentally in the struggle between the prisoner and the deceased.
2. That if he did fire it intentionally, that he was justified in so doing, for it was done in defence of his person and property, and that it could be no more than homicide se defendeudo, and cited Fost. Cr. Law 273 ; 4 Bl. Com. 183 ; M’Nal. Fvi. 562.
3. That if the offence was not homicide se def endeudo it could amount at most to no more than manslaughter.
After Vroom had concluded (which was about eleven o’clock at night) a motion was made, on the part of the defendant, to adjourn the further summing up of the cause until morning, upon *the ground that the jurors and counsel were much exhausted, having commenced the cause at nine o’clock that morning, and having sat all that time *292 without intermission or adjournment. But the Chief Justice refused to adjourn, saying, that it was against the course of practice to adjourn in cases of life and death.*
Wall then proceeded to sum up the cause on the part of the defendant, and relied upon and enforced the same points laid down by Vroom.
Scott concluded the argument on the part of the state.
Kirkpatrick, C. J.,
charged the jury.
Gentlemen: — The defendant’s counsel have.charged the deceased with unjust and fraudulent conduct towards the prisoner, and upon that unjust and fraudulent conduct they found their defence; they say that was the cause which excited the prisoner to do the act. In what did this fraud and injustice of deceased consist? First. The deceased purchased the defendant’s estate at sheriff’s sale, and paid a fair price for it. In this there was nothing unlawful, nothing which ought to excite the anger of the defendant. Second. He prosecutes the defendant in a suit at law and obtains judgment against him- — sues out execution, upon which the defendant is taken and imprisoned. There is nothing unlawful in this. Third. He purchases the possession of a part of the property, and enters upon it, and defendant gives him leave to sow grass seed upon it, thereby giving him possession. After this the defendant interrupts him. Who then is the most to blame ? It appears *293 to me that the deceased acted in this matter like a fair, rational and honorable man. Would it not, in these circumstances, be right to say that the deceased had lawful *possession of the land ? I think it would. In this situation the eyent occurs. If it should be believed that the prisoner did not shoot off the gun intentionally, but that the deceased closed in upon him, seized the gun, and that it went off accidentally in the struggle, the prisoner is not guilty at all. But if you think that was not the case, but believe the principal witness, and that he fired the gun intentionally, he must be guilty either of homicide in self-defence, manslaughter, or murder.
1. Did the defendant believe that the deceased was coming towards him with an intent to kill him or to do him any great bodily injury ? There was nothing which could warrant a belief of that kind. If there was nothing to induce such a belief, then he must be guilty of manslaughter or murder.
2. Manslaughter is where a person kills another upon a sudden transport of passsion or heat of blood, upon a reasonable provocation, and without malice, as for instance, such a sudden attack upon a man’s person that his mind becomes immediately inflamed, and in the fury of his passion kills the aggressor. It is contrary to the whole tenour of our law to allow a man to excuse himself from the guilt of killing another by saying, I got in a passion because he did an unlawful act, or because he entered on my land, and therefore I shot him. No case can be found in the books to warrant the position, that merely because a man is trespassing on my land I may kill him. On the contrary, the law upon this point is well settled, and has been read to you from 4 Mass. Hep. 396, viz. “ that where the trespass is barely against the property of another, not his dwelling house, it is not a provocation sufficient to warrant the owner in using a deadly weapon : and if he do, and with it kill the trespasser, this will be murder, because it is an act of violence beyond the degree of the provocation.”
*294 3. Murder is the killing a reasonable being with malice aforethought, that is, with a deliberate intention or formed design. And the law presumes all homicide to be committed with malice aforethought, and, of course, amounting to murder, until the contrary appears from circumstances of alleviation, excuse, or justification. And it is incumbent upon the prisoner to make out such circumstances to the satisfaction of the jury, unless they arise out of the evidence produced against him. Has the prisoner made out any such sudden provocation as will reduee-Uihe'^offence *to manslaughter ? The mere attempt to come upon his land is not such a provocation. Whether there are any other circumstances sufficient for that purpose, you will judge. With these few remarks, I leave you to your deliberations, reminding you, that while attentively examining the evidence, and seeking for every circumstance which may tend to extenuate his crime, you should be cautious that you do not fix upon this land the blood of a murderer; for the Lord hath declared, that whoso sheddeth man’s blood, by man shall his blood be shed..
The jury then retired to deliberate, and after about six hours returned into court with a verdict finding the prisoner guilty of manslaughter; and the court sentenced him to three years’ imprisonment at hard labor in the state prison and to pay a fine of $1,000.

Note. — See the case of Amasa Fuller, (2 Crim. Rec. 223), where a similar application was refused upon the ground that the affidavit did not state the facts the absent witness was to prove. Also, of Charles Badeliff (Fost. 40); Catharine Foote (1 Crim. Bee. 70).

 Note — I believe the law, on examination, will be found to be in accordance with the opinion of the Chief Justice; *269 for though there are some cases where questions of this kind have been asked a juror, and his answer taken, though not under oath, yet I have mot with no adjudged case where, upon objection made at the time, and solemn argument, such question has been allowed to be put, and the answer of the juror (not under oath) received. But there are several decisions which establish a contrary practice. In England, on the trial of Francis Francia, in 1716, (6 State Trials 58) when one of the jurors (Sir Dennis Dutry) was called, the prisoner observed — “ He has had a quarrel with me, and there was a suit depending between us about seven years ago; and I challenge him for cause.” The Attorney General observed — “ He may challenge him peremptorily if he will, but if he challenge him for cause he must prove it.” Prisoner — “ Sir Dennis will not deny it.” Lord Chief Baron — “ If you challenge him, you must prove your challenge. Do you challenge him for cause, or-peremptorily ?” Prisoner — “For causo.” Lord Chief Baron — That which you assign is no cause.” Then Sir Dennis was sworn upon a voir dire with respect to his freehold, as all the others were, before they were either challenged or sworn in chief." This case, I think, shews that the answer of the juror himself was not sufficient proof of the fact to establish the challenge.
But the case of Peter Cook, in 1796, (4 State Trials 748); same case abridged in 1 Salk. 153, and 1 Trials per Pais 205, goes still farther, and shews not only that the answer of a juror not under oath will not be received, but that a juror would not be permitted, even under oath, to answer the question put in the case of Zellers. Cook offered to ask the jurors, in order to challenge them, if they had not said, he was guilty and ought to be hanged ? El per curiam. *270 This is a good cause of challenge, but then the prisoner must prove it by witnesses, not out of the mouth of the juryman. See also 1 Chit. Gr. Law 550; 3 Bao. Abr. E. 12, 766, same case. In Pennsylvania a similar decision was made in the case of Respublica v. Joseph Dennie, 4 Yeates 267. Previous to the jury being sworn, the counsel for the defendant stated, that they had received information that some of the jurors had declared their opinion in ward meetings on the present publication, and moved the court, that the question should be put to them before they were sworn.
The motion was opposed by the Attorney General, and the court refused to put the question to the jurors. In New York, it was decided by Golden, in the case of Robert Goodwin, (5 O. Hall, Reo. 14) that jurors must answer questions of this kind on oath. In that case “ Van 'Wyok suggested to the court, as the case had excited much interest, whether it would not be proper for the court to ask the jurors, as they were called, whether they had formed an opinion ?” Price, of counsel with the defendant, said — “We wish the court would do this.” The mayor said — “ The court wished to hear counsel on the question, whether, as this was a challenge to the favor, that inquiry ought, not to be on oath ? This course was adopted in the case of Selfridge; but in the several cases of Burr and Fries it was not.” Emmet — “We wish the jurors, as they are called, to be asked the question on oath, but not when the counsel on either side should be able to prove facts sufficient to disqualify the juror by witnesses.” The mayor delivered the opinion of the court— “that the question should be answered by the jurors on *271 oath, but not under the qualification mentioned by Mr. Emmet." Upon that part of the opinion of the mayor which states, that in the cases of Burr and Fries a contrary course was adopted, I would remark, that either his honor was under a mistake, or the reporter did not correctly report his language. For in the case of Fries, page 177, it is expressly stated, that “ before the jury were sworn in, they were individually asked (upon oath) these questions : — “ Are you related to the prisoner?” “Have you ever delivered an opinion as to the guilt or innocence of the prisoner, or that he ought to be punished?” And in the case of Burr, although the first juror was permitted to answer, though not under oath, without any objection from the adverse counsel, yet the second juror, though challenged for the same cause, was examined upon his voir dire, whether he had formed an opinion. It is true that the rest of the jurors were not put upon oath when the same questions were put to them, but it was evidently because no objection was made to this course of proceeding : and therefore this case cannot be considered as an authority for dispensing with the oath. In the case of Milligan § Welchman (6 City Hall Rec. 68) and Mary Riley s case, (1 Ibid. 23) though it does nor appear in the context of the reports whether the jurors were put upon their voir dire or not, yet it is evident from the note of the contents prefixed to the case by the reporter, that he understood that to be the fact. And he further says, in a note to the case of Goodwin, (5 City Hall Rec. 52) “ that a juror, when inquired of by the court whether he has expressed an opinion, must answer under oath.” The *272 only case in which the point was fairly before the court, and which appears to sanction a contrary practice, is a recent decision of Judge Story in the case of the United States v. Cornell, (2 Mason’s Rep. 106) and which certainly, as far as it goes, is (from the respectability of the judge who decided it) entitled to great weight. In that case, the defendant having been convicted of murder, a motion was made for a new trial, and one of the grounds relied on was, “that the court did set .aside two jurors who were summoned in said cause, upon said jurors expressing, without being under oath or affirmation, that they had conscientious scruples against sitting as jurors, and without said jurors being challenged either by the said Cornell or the district attorney.” In speaking of this reason, Judge Story says —“ The objection, however, affects to place some reliance upon the fact, that the jurors were not sworn or affirmed to the truth of their statements. But this was surely unnecessary where no doubt was entertained of their perfect veracity. I agree with the doctrine laid down in the book cited by the prisoner’s counsel, that where the jurors challenge themselves they may be sworn to the truth of their asseverations. 1 Chit. Crim. Law 584. But when these are undoubted, of what use can it be to make assurance doubly sure ? I may add, that in all the courts of New England 'where I have seen practice, the course pursued on this occasion has been uniformly adopted. I do not deny that the facts to establish a lawful challenge to the polls may be ascertained by triors, according to the course of the common law; all I assert is, that it is not the usual or necessary mode with us: and, least of all, is it proper where the facts are not disputed, and the cause of challenge is apparent and admitted, and *273 resolves itself into a mere point of law.” This is a case where the juror challenges himself, and assigns a cause which is admitted by both .parties, and therefore differs materially from a case where a party challenges and seeks to sustain his challenge by the word of the juror, without oath, or where he asks the question with a view to found a challenge upon it. The great point, however, of the objection in the case of United States v. Cornell appears to be, that the court set the jurors aside upon their own mere motion, without appointing triors to determine the truth of the challenge. As far as it may be considered an authority upon that point, it comes in collision with the case of Den v. Pissant and Lardner, (1 Coxes Rep. 39) where it was decided that a juror had no right to challenge himself. Besides Judge Stoky appears to rest his opinion pretty much upon the course of practice in the courts of New England.
That the practice in New England is as laid down, the general accuracy of the learned judge who states it, will not permit me to doubt, although I can find no adjudicated case in any of the New England reports which sanction it, and although I should have been led by the case of Jeffries et al. v. Randall (14 Mass. 205) to a contrary opinion, as it regarded the practice in the state of Massachusetts: but, however that may be, a mere course of practice, where matters may have passed sub silentio, although sufficient in New England to warrant the judge, under the circumstances of that case, in refusing a new trial, is not, in my apprehension, sufficient to overturn the settled decisions already cited upon this subject.
Since writing this note, I have met with the case of the King v. Edmonds et al., decided in England in 1821, (4 *274 Barn, and Ald. 471,) where the subject came under consideration of the Court of King’s Bench, and in which Chief Justice Abbott fully sustains the opinion of Chief Justice Kirkpatrick on this point. . In that case there was a challenge made to one of the jurors on the ground of opinions supposed to have been expressed by him hostile to the defendants and their cause. There was no offer to prove such an expression by any extrinsic evidence; but it was proposed to obtain the proof by questions put to the jurors themselves. The Lord Chief Baron, who tried the cause, refused to allow such questions answered. And, upon a motion for a new trial, this refusal was one of the reasons relied upon. The Lord Chief Justice Abbott, in delivering the opinion of the court, said — “ That in our opinion the Lord Chief Baron was right in the refusal.” He then goes over the old authorities upon the subject, and concludes by saying — “ These ancient authorities shew that expressions used by a juryman are not a cause of challenge, unless they are referred to something of personal ill will towards the party challenging; and also, that the juryman himself is not to be 'sworn where the cause of challenge tends to his dishonor; and to be sure it is a very dishonorable thing for a man to express ill will towards a person accused'of a crime, in regard to the matter of his accusation. And accordingly we find it established in later times, namely, at the trial of Peter Cook, (13 State Trials, Howell,) in the eighth of King William the Third, that such questions are not to be put to the juror himself. So that all the authority in the law, on this head, is against the defendants, and shews that the refusal of the Lord Chief Baron to allow the proposed questions to be answered by the special juror was most proper and agreeable to law.” See the case reported in Eng. Com. Law Rep. 491, 502.

Note. — This rule was laid down in the case Lord Audley in the 7th of Charles I. 1631, 1 St. Trials 388. Also in the case of Lord Delamere in 1685, 4 St. Trials 230. But this rule has not always been followed in this country, or even in England. ,
Upon the subject generally, of jurors separating before giving their verdict, see all the cases collected in a valuable note by Mr. Cowen in the first volume of his Reports 221.