46 A.3d 616

IN THE MATTER OF THE STATE OF NEW JERSEY, THROUGH THE ESSEX COUNTY PROSECUTOR'S OFFICE, COMPELLING THE JURY MANAGER TO PROVIDE INFORMATION ON PROSPECTIVE JURORS.

Superior Court of New Jersey
Law Division Essex County

Decided February 27, 2012.

*Howard D. Zuckerman*, Special Deputy Attorney General/Acting Essex County Deputy Chief Assistant Prosecutor, and *Sara A. Friedman*, Special Deputy Attorney General/Acting Assistant Prosecutor for the State (*Carolyn A. Murray*, Acting Essex County Prosecutor, attorney).

*Michael Marucci*, Deputy Public Defender, and *John J. McMahon*, Assistant Deputy Public Defender (*Joseph E. Krakora*, Public Defender, attorney).

*Alexander R. Shalom* for amicus curiae American Civil Liberties Union of New Jersey.

*Leslie Stolbof Sinemus* for amicus curiae Association of Criminal Defense Lawyers of New Jersey.

COSTELLO, A.J.S.C.

This matter comes before the court by way of an application filed by the Acting Essex County Prosecutor to have this court order the jury manager to turn over the dates of birth of certain persons in the petit jury pool to the State to facilitate running criminal background checks on those potential jurors. The application is opposed by the Office of the Public Defender.

The American Civil Liberties Union of New Jersey ("ACLU–NJ") and the Association of Criminal Defense Lawyers–New Jersey ("ACDL–NJ") have filed requests to appear as amicus curiae, with accompanying briefs on both the amicus issue and the substantive issue. Both join the Public Defender in opposing all or parts of the State's request. The State opposes their participation.

The State's request is essentially to be allowed in certain future unspecified cases access to the dates of birth of petit jurors contained in the Judiciary's database for the purpose of more easily and accurately determining if any of the potential jurors have criminal convictions. The State seeks this remedy first to avoid the legal issues of having an unqualified juror sworn in.

These issues can present when a juror is discovered as unqualified before a verdict, but so late in deliberations as to cause a mistrial, or when that juror participates in rendering a guilty verdict, and the verdict is challenged on appeal due to the unqualified juror having voted. The State also seeks to root out all instances in voir dire of a juror having lied or given inaccurate information about prior criminal involvement.

The motions for leave to appear as amicus curiae are granted. A motion for leave to appear as amicus curiae should be granted if the court "is satisfied under all the circumstances that the motion is timely, the applicant's participation will assist in the resolution of an issue of public importance, and no party to the litigation will be unduly prejudiced thereby." *R.* 1:13-9. Amici curiae applications are not granted as a matter of right, but as "a privilege resting solely in the sound discretion of the court." *Casey v. Male,* 63 *N.J.Super.* 255, 259, 164 *A.*2d 374 (Law Div. 1960).

Traditionally, the role of amicus curiae was to be advisory rather than adverse. *Id.* at 258, 164 *A.*2d 374. However, courts have generally shifted away from the strict *Casey* framework and now allow amici curiae to be more partial. *See Neonatology Assocs., P.A. v. Comm'n of Internal Revenue,* 293 *F.*3d 128 (3d Cir.2002). *Rule* 1:13-9 has been interpreted as establishing "a liberal standard for permitting amicus appearances." *Pfizer, Inc. v. Dir., Div. of Taxation,* 23 *N.J.Tax* 421, 424 (2007).

In determining whether to grant an amicus application, courts consider whether the applicant can assist the court by providing "the court with information pertaining to matters of law about which the court may be in doubt." *Keenan v. Bd. of Chosen Freeholders,* 106 *N.J.Super.* 312, 316, 255 *A.*2d 786 (App.Div.1969). Courts also consider whether the case has "broad implications," *Taxpayers Association v. Weymouth Township,* 80 *N.J.* 6, 17, 364 *A.*2d 1016 (1976), or is of "general public interest." *Casey, supra,* 63 *N.J.Super.* at 259, 164 *A.*2d 374.

■ The ACLU–NJ has established that it meets the require-
ments of *Rule* 1:13–9. First, the ACLU–NJ filed its motion in a
timely manner. Second, the ACLU–NJ's participation will assist
in resolving an issue of public importance. The ACLU–NJ's
expertise on privacy issues, and its experience participating as
amicus curiae in other cases involving the jury selection process,
will assist the court in resolving the privacy issues presented in
this case. Third, while the position of the ACLU–NJ is clearly
more aligned with that of the Public Defender and the defense bar
than that of the State, no party to the litigation will be unduly
prejudiced by the ACLU–NJ's participation. This case has broad
implications and is of general public interest because the results of
the case will affect the experiences of many prospective jurors.
Therefore, the relevant court rule and case law support the
participation of the ACLU–NJ in this matter.

■ The ACDL–NJ has also met the requirements of *Rule*
1:13–9. Although the ACDL–NJ did not file its brief by the
deadline set by the court, the State did not object to the lateness
of the ACDL–NJ's submission. The brief was filed before oral
argument and did not cause a delay in either the oral argument or
the issuance of the decision. The ACDL–NJ's participation is
helpful to the court because it represents a different constituency
with a different perspective than that of either party: the inter-
ests of the statewide criminal defense bar, including members of
the private bar. No party to the litigation has claimed it will be
unduly prejudiced by ACDL–NJ's participation in this matter.

Voir dire questioning of potential jurors in New Jersey has
evolved from a common law system in which no questioning was
allowed absent an extrinsically established cause for challenge, to
a system in which jurors are asked multiple questions about their
personal lives to allow attorneys to more intelligently exercise
their peremptory challenges. Finding the process at one point to
have veered too close to full-on interrogation of potential jurors by
attorneys, however, the Supreme Court has also curbed this
evolution of voir dire, by placing the power to question in judges

rather than attorneys. Here, the State asks that the evolution take a novel leap: to have the Judiciary affirmatively enable investigative searches into potential jurors by the State. This proposed new step is not consonant with the evolving history of jury selection procedures in New Jersey.

New Jersey laws concerning voir dire questioning of potential jurors originated from the English common law tradition, in which "the rule has always been that such examination may be conducted only after a challenge for cause has been interposed, and then in support of the challenge.... One basic reason was the fundamental confidence in the English juror's fair-mindedness vitalized by his oath." *State v. Manley*, 54 *N.J.* 259, 272, 255 *A.*2d 193 (1969) (citing Moore, *Voir Dire Examination of Jurors: I. The English Practice*, 16 *Geo. L.J.* 438 (1928)). New Jersey initially followed this common law approach, the State's highest court twice holding in the nineteenth century that no juror could be questioned under oath unless the facts underlying a challenge were established in court by extrinsic evidence. *Clifford v. State*, 61 *N.J.L.* 217, 39 *A.* 721 (E. & A.1897); *State v. Zellers*, 7 *N.J.L.* 220 (Sup.Ct.1824). In each case, the Court based its decision to bar questioning jurors in part on the premise that jurors would not be placed under oath without proof of their disqualification first shown by extrinsic evidence.

In *Zellers, supra*, 7 *N.J.L.* at 223 the Court acknowledged that the practice of questioning unchallenged jurors prior to swearing had been "slipped into," and in a separately issued footnote the case laid out a sampling of different approaches to the issue taken in jurisdictions throughout New England, from Pennsylvania's adherence to the English common law system, to New York City's accepted practice of placing potential jurors under oath to be questioned concerning bias, to the District of Rhode Island Circuit Court's practice of allowing potential jurors to be questioned in court without their first being challenged or placed under oath. *Id.* at 223–27 (citing *Respublica v. Joseph Dennie*, 4 *Yeates* 267 (1805), *In re Robert Goodwin*, 5 *City Hall. Rec.* 14, and *United*

*States v. Cornell,* 2 *Mason's Rep.* 106.) In refusing to allow the defendant's attorney to ask whether a potential juror had already come to a conclusion regarding the defendant's guilt, the Court reasoned that, "What a man says, not under oath, cannot be received in any form." *Id.* at 222. The Court did not consider the possibility that the prospective juror might be placed under oath prior to this general questioning. The *Zellers* Court held, in language quoted approvingly seventy-three years later in *Clifford,* that "the only proper way is, to make the challenge, and then prove it upon oath." *Ibid.*

In *Clifford,* without having first challenged the jurors he sought to question, counsel for the defendant sought to ask potential jurors general questions, "'so that the right of exercising a peremptory challenge may be intelligently used.'" *Clifford, supra,* 61 *N.J.L.* at 221, 39 *A.* 721. The trial court refused to permit the questioning since "the juror was not put under oath, and it was not proposed to put him under oath." *Ibid.* The appellate court affirmed, and went on to excoriate the proposed practice as a license to cause "unseemly, vexatious and expensive delays." *Id.* at 223, 39 *A.* 721. In explaining the proposed questioning's negative implications, the Court assumed that, if questioning were allowed, it would not be conducted under oath. The Court proceeded on the premise no oath could be administered absent extrinsic evidence and used that lack of an oath as a justification to refuse to allow the individual to be questioned:

> If the court is bound to permit counsel to engage in a public conversation with each juror, for the purpose of enabling counsel to determine whether he should interpose a challenge or not, what control has the court over the examination? Where can it draw the line between proper and improper questions, when the purpose of the talk is not to prove a fact or to establish a challenge, but only to furnish counsel information? How is a juror to be protected against improper questions, except by his refusal to answer them? And if he refuses to answer proper questions, what power has the court to compel him to answer? Or, if a juror is anxious to escape service, how can it be discovered whether his answers, not given under the sanctity of an oath, are true or false?
>
> [*Ibid.*]

Both in *Zellers, supra,* 7 *N.J.L.* at 222–23, and, seventy-three years later, in *Clifford, supra,* 61 *N.J.L.* at 221–23, 39 *A.* 721, the

common law practice was upheld, and the rule stood that prospective jurors were not allowed to be questioned without an independent evidentiary showing of a cause for challenge.

Not long after *Clifford*, New Jersey began to move by legislation toward the modern American version of voir dire, in which jurors may be questioned to enable the intelligent exercise of peremptory and for-cause challenges. There was never, however, a corresponding move away from the traditional practice, clearly embraced by the nineteenth century courts, whereby potential jurors are not placed under oath, absent an extrinsically established challenge for cause, prior to being sworn as the jury in a particular case. The state's first law permitting peremptory challenges in civil cases, *L.* 1911, *c.* 151, passed in 1911, also permitted the questioning of potential jurors, "for the purpose of disclosing whether or not the juror is impartial as between the parties to the suit." *See Wright v. Bernstein*, 23 *N.J.* 284, 293, 129 *A.*2d 19 (1957). The statute made no provision with respect to oaths taken by prospective jurors questioned under it, and no reported cases address the issue directly.[1]

The 1911 statute's provision authorizing questioning of jurors was held to apply only to civil suits, *Lamble v. State*, 96 *N.J.L.* 231, 234, 114 *A.* 346 (1921), and the 1931 statute (*L.* 1931, *c.* 298) concerned only capital punishment cases,[2] leaving the questioning of potential jurors in ordinary criminal trials not provided for except by the decisions in *Zellers* and *Clifford* until the middle of the 20th Century. *Rule* 2:7–2(b), which was passed on September

---

[1] Decades later, however, a New Jersey Law Journal article noted that the "informal examination of jurors permitted by the statute in civil actions" was in contrast to the questioning of jurors in capital-punishment cases, which had been permitted to be "under oath" by a 1931 statute, *L.* 1931, *c.* 298. *The Examination of Prospective Jurors in Criminal Actions*, 72 *N.J.L.J.* 105, 107 (1949).

[2] Since the State's death penalty statute was repealed in 2007, all laws and court rules pertaining to only death penalty cases have been rendered obsolete. *N.J.S.A.* 2C:11–3.

15, 1948, only codified the common law with regard to the issue in non-capital criminal cases, and prompted criticism for so doing in the New Jersey Law Journal. *State v. Manley, supra*, 54 *N.J.* at 274–75, 255 *A.*2d 193 (citing *The Examination of Prospective Jurors in Criminal Actions*, 72 *N.J.L.J.* 105 (1949)). Following the criticism, *Rule* 2:7–2(b) [3] was amended on November 10, 1949, to finally and for the first time formally authorize voir dire questioning of potential jurors in non-capital criminal cases in New Jersey:

" * * * after a juror's name is drawn from the box and without putting him under oath, questions may be asked of him and shall be permitted, within the discretion of the court, for the purpose of determining whether or not to interpose a peremptory challenge and of disclosing whether or not there is cause for challenge."

[*State v. Manley, supra*, 54 *N.J.* at 275, 255 *A.*2d 193 (citing *R.* 2:7–2(b) (1949)).]

When the Legislature enacted *N.J.S.A.* 2A:78–4 (repealed 1995),[4] the law was consistent with *R.R.* 3:7–2(b) (1958), and it spoke with perfect clarity to the issue of oaths to be taken by potential jurors: "In all cases in which a death penalty may be imposed, the examination as to competency shall be under oath, but in other cases it shall be made without putting the juror under oath." [5] The statute's text also defined the meaning of the "competency" permitted to be examined under it:

---

[3] *Rule* 2:7–2 was later replaced by *R.R.* 3:7–2(b) in 1958, and finally replaced again by *Rule* 1:8–3(a) in 1969.

[4] Later replaced by *N.J.S.A.* 2B:23–10.

[5] A 1954 Appellate Division case that has never been cited to, approvingly or disparagingly, on this point, sought to establish the obligations of potential jurors with respect to voir dire questioning. *Springdale Park v. Andriotis*, 30 *N.J.Super.* 257, 104 *A.*2d 327 (App.Div.1954). The *Andriotis* court wrote broadly about the nature of voir dire procedures, but with a lacuna in its treatment of the contentious history of the issue: "That a party to litigation may examine into the qualifications, attitudes and inclinations of jurors, before they are impaneled and sworn to try a case, it being a necessary incident to the practice of challenging, is unquestioned." *Id.* at 262, 104 *A.*2d 327. It cited to *Ballentine's Law Dictionary* for a definition of voir dire, ("To speak the truth ...”), and cited to *American Jurisprudence* as both its direct and indirect evidence to support its conclusion that, "it becomes the duty of a juror to make full and truthful answers to such

Upon the trial of any cause, civil or criminal, all parties may, within the discretion of the court, question any person summoned as a juror ... without the interposition of a challenge, to elicit information for the purpose of determining whether or not to interpose a peremptory challenge, and of disclosing whether or not there is a cause for challenge.

[*N.J.S.A.* 2A:78–4 (repealed 1995).]

The statute did not refer directly to the issue of juror qualifications.

Questioning and challenging with respect to the basic statutory qualifications to serve on any jury in the State of New Jersey were instead addressed by *N.J.S.A.* 2A:78–6 (repealed 1995).[6] That statute read in pertinent part: "[I]t shall be good cause of challenge to any person summoned as a grand juror or as a petit juror ... that he does not possess the qualifications required by section 2A:69–1." *N.J.S.A.* 2A:78–6 (repealed 1995).[7] It continued: "Such person shall be discharged upon such challenge being verified according to law *or on his own oath in support thereof.*" *Ibid.* (emphasis added).[8] Although the two statutes fit together uneasily, close examination reveals that they were not contradictory: Although *N.J.S.A.* 2A:78–6 instructed that an individual's failure to satisfy the statutory qualifications for jury service was a "good cause of challenge," and that exclusion on the basis of that challenge could be based entirely on a potential juror's "own oath in support thereof," *N.J.S.A.* 2A:78–4 nevertheless retained the common law rule that voir dire examination of jurors not take

---

questions as are propounded to him." *Id.* at 263, 104 *A.2d* 327 (citing *Ballentine's Law Dictionary* (2d ed. 1948) and 31 Am.Jur., Jury, secs. 104, 107, and 108, pages 635, 636, and 638).

[6] Later replaced by *N.J.S.A.* 2B:23–11.

[7] *N.J.S.A.* 2A:69–1 (repealed 1995) was later replaced by *N.J.S.A.* 2B:20–1.

[8] The previous statutory scheme regarding juror qualifications also included a provision that required "the assignment judge of the Superior Court for the county [to] closely check the grand jury list and petit jury list for the purpose of removing from such lists the names of such persons as may, in the opinion of the assignment judge, be unfit for service." *N.J.S.A.* 2A:70–2 (repealed 1995). The current statutory scheme has no analogous provision.

place under oath. New Jersey's move toward a more liberal version of voir dire, therefore, unlike the practice that would be developed in other jurisdictions, never became so liberal as to condone the practice of placing potential jurors under oath during preliminary questioning in non-death penalty criminal cases.[9]

Further, the evolution of voir dire practice toward the increased scrutiny of potential jurors was affirmatively curtailed by the Supreme Court over forty years ago. The modern Court Rule, *Rule* 1:8–3(a), took effect in 1969, and placed the responsibility for voir dire questioning plainly in the hands of the trial judge rather than the attorneys: "For the purpose of determining whether a challenge should be interposed, the court shall interrogate the prospective jurors ... without placing them under oath. The parties or their attorneys may supplement the court's interrogation in its discretion." *R.* 1:8–3(a). The Supreme Court shortly thereafter explained how it expected the Rule to be administered:

> In order to accomplish the purpose of *Rule* 1:8–3(a), the trial court in administering the discretionary portion thereof must exercise considerable restraint over supplementary questioning by counsel. The basic intent is to have the voir dire conducted exclusively by or through the trial judges to the extent reasonably possible.
>
> [*Manley, supra,* 54 *N.J.* at 282, 255 *A*.2d 193.]

The Court held that the rule change had been necessitated because attorneys' interrogations of jurors "got out of hand." *Id.* at 276, 255 *A*.2d 193. It criticized those attorneys for misusing the process:

> Counsel began to subvert the function which was to assist in the impaneling of an impartial jury by using it to educate the jury panel on the facts of the particular case, to prejudice the jury for or against a particular party, to argue the case, to indoctrinate the jury, to induce the jurors by use of the hypothetical questions or otherwise to commit themselves to vote in a particular way, or to instruct them in matters of law.
>
> [*Ibid.*]

---

[9] This statutory scheme was not affected in this respect when *N.J.S.A.* 2A:78–1 to 9 was replaced in 1995 by *N.J.S.A.* 2B:23–1 to 18.

It noted that, "In many instances it has taken as long or longer to impanel a jury as to try the case," *id.* at 281, 255 *A.*2d 193, and that the new system would, "avoid the unreasonable expense of a protracted jury examination, . . . obviate the expense of wasted court time and serve the interest of . . . the judicial system in the effective and productive dispatch of its business." *Id.* at 282, 255 *A.*2d 193. Although the Administrative Office of the Courts issued directives in 2006 and 2007 [10] further clarifying proper voir dire procedures, neither *Rule* 1:8–3(a), nor the holding in *Manley* regarding its need and function, has been significantly changed in the years since.[11]

The history of jury selection in New Jersey, thus, is one in which jurors in non-capital criminal cases have been permitted by law to be questioned only according to limited, prescribed guidelines and almost never under oath.[12] In some ways, the action proposed here by the State would represent a next step in a

---

[10] Administrative Directive # 21–06 from Philip S. Carchman, J.A.D., Acting Administrative Director of the Courts, New Jersey Administrative Office of the Courts, to Superior Court Judges (Dec. 11, 2006), http://www.judiciary.state.nj.us/directive/2006/dir_21_06.pdf; and Administrative Directive # 4–07 from Philip S. Carchman, J.A.D., Acting Administrative Director of the Courts, New Jersey Administrative Office of the Courts, to Superior Court Judges (May 16, 2007), http://www.judiciary.state.nj.us/directive/2007/dir_04_07.pdf.

[11] The current Juror Qualification Form contains a space for the juror to enter a date of birth and to answer the following question: "Have you ever pleaded guilty or been convicted of an indictable offense? The current Model Voir Dire questions for criminal cases include the following questions: "1. . . . Also, a juror must not: have been convicted of any indictable offense in any state or federal court . . . Is there any one of you who does not meet these requirements? . . . 18. Have you or any family member or close friend ever been accused of committing an offense other than a minor motor vehicle offense?"

[12] There is some disconnect between *N.J.S.A.* 2B:23–10 and *N.J.S.A.* 2B:23–11 (echoing the same disconnect that existed between the predecessor statutes, *N.J.S.A.* 2A:78–4 and *N.J.S.A.* 2A:78–6) as to whether a juror can be discharged for cause solely on the basis of the juror's sworn statement, or whether extrinsic evidence was also required. There are no reported cases in which a juror was questioned under oath about his or her qualifications.

progression from a system in which jurors are implicitly trusted to one in which their disinterest and qualifications to sit on a case are verified by pre-trial investigation. In other ways, though, the proposed practice would represent an acute departure from even the evolving nature of the Judiciary's examination into the qualifications of potential jurors.

The State's proposal is not entirely clear. When pressed about the logistics at oral argument, the State said that it might request the birth dates once the list is narrowed down to fourteen and the jurors are seated in the jury box for questioning, but that in some cases it might request the birth dates earlier in the selection process. As for sharing information with defense counsel, the State proposed that it share the results of the background checks with the court and with the defense only when the report reveals that a prospective juror has not been truthful or accurate about his or her criminal record. During oral argument, the State was not prepared to explain to the court exactly what other information is listed in a criminal background report. The State was fairly certain, however, that the report includes the individual's address, social security number, arrests, convictions, and juvenile record. The State was not inclined to share the street address, the social security number or the juvenile history with the defense.

The State's basis for withholding this information is that the State would access the criminal history pursuant to its authority as a criminal justice agency under N.J.A.C. 13:59-4, which precludes it from disseminating that information except as authorized by law. The State argues that handing over evidence of a prospective juror's criminal record to defense counsel would be authorized by court order (assuming this court grants the present motion), to ensure the fairness of the jury selection process. The State argues that it would not be authorized to reveal the other information contained in the report, and it would not ask the court to authorize it to release that information to the defense.

The Assignment Judge is responsible for selecting individuals at random from the juror source list to be summoned for service.

*N.J.S.A.* 2B:20–4(a). The Assignment Judge may send out questionnaires to verify that the individuals are qualified to serve on a jury. *N.J.S.A.* 2B:20–3(a). The Assignment Judge then narrows down the list to only qualified jurors and composes a panel list for the jurors to be summoned that provides the "name and address, and if available, the occupation of each juror to be summoned." *N.J.S.A.* 2B:20–4(b). This list must be made available by the clerk of the court "to any party requesting the same at least ten days prior to the date fixed for trial . . ." *R.* 1:8–5. During voir dire the prosecution and defense have "good cause to challenge" any juror about whether he or she is qualified to serve. *N.J.S.A.* 2B:23–10. The State argues that while certain information is required to be included in the panel list, the statute does not specifically restrict the Assignment Judge from providing other information on the list, such as birth dates.

The State also argues that its enforcement power gives it authority to verify the criminal history of potential jurors. As the chief law enforcement officer of Essex County, the State has the duty to "use all reasonable and lawful diligence for the detection, arrest, indictment and conviction of offenders against the laws." *N.J.S.A.* 2A:158–5. Confirming that jurors are qualified, the State argues, falls under this duty.

To further support this claim, the State argues that the New Jersey Administrative Code provides a basis for the State to obtain jurors' birth dates. The applicable portion of the Code states that "criminal justice agencies, for purposes of the administration of criminal justice, may . . . access information collected by criminal justice agencies . . . containing criminal history record information." *N.J.A.C.* 13:59–2.1. The State and the courts are considered criminal justice agencies. *N.J.A.C.* 13:59–1.1. Nowhere in the Code, however, does it state that the court is obligated to provide other criminal justice agencies with information they require in order to facilitate criminal background checks.

No New Jersey case has dealt directly with the issue of the

State running criminal histories of prospective jurors.[13] The State argues several federal and out-of-state cases support its position. The Second Circuit has held that investigating jurors would not discourage them from serving. *United States v. Falange*, 426 *F.*2d 930, 933 (2d Cir.1970), *cert. denied,* 400 *U.S.* 906, 91 *S.Ct.* 149, 27 *L.Ed.*2d 144 (1970). A Virginia state court held that the prosecutor's office was authorized to review criminal background records of prospective jurors on the ground that such review fell under the prosecutor's responsibility to administer justice. *Salmon v. Virginia,* 32 *Va.App.* 586, 529 *S.E.*2d 815 (2000). The Massachusetts Supreme Court has also found that reviewing jurors' criminal records for the purpose of determining their qualifications falls under the Commonwealth's criminal justice obligations. *Commonwealth v. Cousin,* 449 *Mass.* 809, 873 *N.E.*2d 742 (2007), *cert. denied,* 553 *U.S.* 1007, 128 *S.Ct.* 2053, 170 *L.Ed.*2d 798 (2008). Several other states have come to similar conclusions.[14]

However, states in which courts have permitted the prosecution to conduct record checks on jurors are largely distinguishable because under the jury selection procedures in those states, juror

---

[13] The only arguably related case is an unpublished civil case, *Carino v. Muenzen,* No. A–5491–08, 2010 *WL* 3448071 (App.Div. August 30, 2010), *certif. denied,* 205 *N.J.* 100, 13 *A.*3d 363 (2011) cited to by both the State and the Public Defender for the proposition that an attorney is not prohibited from conducting an internet search on a prospective juror during jury selection. The case has no precedential value here, and the facts are sufficiently dissimilar to make the limited holding inapplicable in any event.

[14] *See Tagala v. Alaska,* 812 P.2d 604 (Alaska Ct.App.1991) (holding that the privacy and security interests of private citizens did not overcome the state's interests, and thus the state was authorized to perform background checks on potential jurors); *People v. McIntosh,* 400 *Mich.* 1, 252 *N.W.*2d 779 (1977) (finding that it was proper for the prosecution to create a dossier on the jury panel from public records, and that the information did not necessarily need to be shared with the defense), *overruled on other grounds by People v. Weeder,* 469 *Mich.* 493, 674 *N.W.*2d 372 (2004); *State v. Jordan,* 167 *Ohio App.*3d 157, 854 *N.E.*2d 520 (2006) (holding that the prosecuting attorney was permitted to run criminal record checks on jurors and that the prosecutor was not required to turn the records over to the defense during jury selection).

qualification checks are historically or statutorily done by the prosecution. That is not the practice in New Jersey. The Massachusetts case is distinguishable because under that state's scheme, jury qualification checks are done by law enforcement and not by the state judiciary.

The opposition filed by the Public Defender rests on several arguments. First, it argues that the release of jurors' dates of birth is not authorized by statute. Second, the Public Defender raises privacy concerns, and argues there is no case law to support the State's request. The Public Defender also argues that all information in the possession of the State must be turned over to the defense to secure a defendant's constitutional right to a fair trial pursuant to the Fifth and Fourteenth Amendments to the United States Constitution.

The ACLU–NJ similarly argues the release of birth dates is not authorized by statute and that the State has not demonstrated a legitimate need to override jurors' privacy concerns. The ACLU–NJ also argues that if the birth dates are to be used to do background checks, the function should be performed by the Judiciary in a uniform manner for all jurors. Finally the ACLU–NJ argues that if this court decides to allow the use of juror birthdates, the search for records must be done by the court, to assure uniformity, a level playing field in that identical information is disseminated to each side, and the best protection for privacy interests. It further argues that the check must be done for every juror in every case, and not just in cases chosen at the whim of the prosecutor's office.

The ACDL–NJ argues that the jury selection process is uniquely the province of the Judiciary, and not a law enforcement prerogative. *See In re Supervision & Assignment of the Petit Jury Panels in Essex County*, 60 *N.J.* 554, 292 *A.*2d 4 (1972). It argues that the historical reasons for the jury supervision being vested in the Judiciary suggest the supervision should not be lightly ceded to the State. All of the opposition briefs point out that handing over birth dates would facilitate the ability to search

multiple databases, well beyond ordering a Computerized Criminal History report for the purported purpose of checking jurors' eligibility or to verify the accuracy of their answers to questions about their prior arrest history.

The State's application does not present the simple solution to a straightforward problem that its papers suggest. The specific action requested, that the Judiciary distribute potential jurors' birthdates to the State, is both concrete and straightforward, and could be achieved with relative ease. Whether to grant the request, however, requires careful consideration of a number of complex issues: whether there exists credible legal authority to grant the request, whether the application infringes on the privacy rights of jurors and on balance whether there is a serious enough problem to warrant the requested intrusion, and whether the proposed solution raises due process concerns that require it be implemented in a particular way, or preclude its implementation entirely.

The right to privacy includes " 'the right to be free from the government disclosing private facts about its citizens.' " *Doe v. Poritz*, 142 *N.J.* 1, 77, 662 *A.*2d 367 (1995) (quoting *Ramie v. City of Hedwig Vill.*, 765 *F.*2d 490, 492 (5th Cir.1985), *cert. denied*, 474 *U.S.* 1062, 106 *S.Ct.* 809, 88 *L.Ed.*2d 784 (1986)). To determine whether that right has been violated, a court must determine, first, "whether, and to what extent, [there is] a reasonable expectation of privacy in the information disclosed," and, if there is such a reasonable expectation, "whether the intrusion on the right of privacy is justified, balancing the governmental interest in the disclosure against the private interest in confidentiality." *Ibid.* Here, the analysis concerns whether the right to privacy would be violated by the action proposed by the State.

As to the reasonable expectation of prospective jurors in the confidentiality of their dates of birth, notwithstanding their own dissemination of that information on their juror qualification forms, the ACLU–NJ argues persuasively that such a reasonable expectation does exist. The ACLU–NJ first establishes, using

outside authority, that there may be an expectation in one's own date of birth generally. *See Scottsdale Unified School Dist. No. 48 v. KPNX Broad. Co.*, 191 *Ariz.* 297, 955 *P.*2d 534, 538–39 (1998); *La. Att'y Gen. Op. 09–0298* (April 5, 2010). Disclosure of birthdates to the Judiciary does not necessarily waive the right against dissemination of that information to law enforcement. *See e.g., State v. Reid*, 194 *N.J.* 386, 945 *A.*2d 26 (2008); *State v. Domicz*, 188 *N.J.* 285, 907 *A.*2d 395 (2006); *State v. McAllister*, 184 *N.J.* 17, 875 *A.*2d 866 (2005); *State v. Mollica*, 114 *N.J.* 329, 554 *A.*2d 1315 (1989); *State v. Hunt*, 91 *N.J.* 338, 450 *A.*2d 952 (1982).

 The court finds that prospective jurors have a reasonable expectation of privacy in their dates of birth, and that that expectation is not waived by their submitting that information on their juror qualification forms. By analogy, the Louisiana Attorney General's logic is compelling here: "it is the opinion of this office that an individual public employee has an expectation that his or her date of birth and age will remain private, and that this expectation is something that society at large is prepared to recognize as reasonable." *La. Att'y Gen. Op. 09–0298, supra,* at 7. The court declines to find that the disclosure of that information to the Judiciary on the juror qualification form, which all prospective jurors are required to fill out, waives that expectation. When individuals submit their identifying information to the Judiciary, it is a reasonable expectation that that information will be used only by the Judiciary, and will not be further disseminated to the prosecutor's office for law enforcement purposes.

The State's application seeks access to potential jurors' birthdates in order to more easily research those individuals' criminal histories, as it argues it is authorized to do under *N.J.A.C.* 13:59–1 to –2.4.[15] The application does not seek an affirmation of the

---

[15] The issue of whether *N.J.A.C.* 13:59–1 to –2.4 actually authorizes the State to conduct criminal background checks on potential jurors is not before the court in this application. The issue of the propriety of that procedure and whether any or all of the results discovered by using it must be shared with the defense was

State's position with respect to *N.J.A.C.* 13:59–1 to –2.4, however. Instead, it requests that the Judiciary enable it to better conduct such criminal searches of prospective jurors, by providing it with those prospective jurors' identifying information. If the Judiciary is to disseminate the personal information it collects from administering the county's jury-related functions, it must first and foremost be convinced that there is a genuine need that can in some way be addressed by that dissemination. Here, although the State's brief demonstrates that unqualified individuals' service as jurors can be a legitimate public problem, it does not demonstrate that it has been so in New Jersey, or that this problem is sufficiently serious as to merit the solution it proposes. Its proposed relief would not merely serve the neutral concerns of ensuring the efficiency and validity of court proceedings, but would instead in large part serve to benefit the State's own interests at the expense of criminal defendants.

With consent of all counsel, I take judicial notice that in the past five years, there have been almost 735,000 jurors summoned in Essex County, and 108,000 jurors have reported to a courtroom for a voir dire in a criminal case. The ACLU–NJ extrapolates from other records there have been approximately 700 criminal trials during this period. No party challenged this estimate.

The State has only been able to cite to three Essex County cases in its brief as contemporary examples in which the independent verification of potential jurors' criminal histories could have been helpful. *State v. Pierrevil and Rollins,* Indictment No. 2009–1–262; *State v. Saladin Thompson,* Indictment No. 2006–1–162; *State v. Alfaro,* Indictment No. 2008–09–02688. In none of these three cases, however, was an individual alleged to have been disqualified from jury service by reason of a prior criminal conviction. Rather, all three instances involved challenges to jurors' credibility based on inaccurate answers to voir dire questions that

not briefed, and the opponents rightfully urge that it should not be addressed in this opinion.

did not concern qualifications: in *Pierrevil and Rollins*, a potential juror was found to have been previously charged with a criminal offense; in *Thompson*, a potential juror was found to have been previously accused of a crime; and, in *Alfaro*, a sitting juror was found to have had an open charge pending against her. These incidents neither demonstrate cause for substantial concern, nor necessitate a judicial reaction that would infringe on the privacy rights of prospective jurors.

█ The State does cite to a number of cases that hold that when juror bias or disqualification is not uncovered until after deliberations have begun, entire proceedings can be tainted and mistrials can ensue. *See State v. Jenkins*, 182 *N.J.* 112, 861 *A.*2d 827 (2004); *State v. Hightower*, 146 *N.J.* 239, 680 *A.*2d 649 (1996); *Wright v. Bernstein, supra*, 23 *N.J.* at 294–95, 129 *A.*2d 19; *State v. Farmer*, 366 *N.J.Super.* 307, 841 *A.*2d 420 (App.Div.2004), *certif. denied*, 180 *N.J.* 456, 852 *A.*2d 192 (2004); *State v. Harvey*, 318 *N.J.Super.* 167, 723 *A.*2d 107 (App.Div.1999); *State v. Thompson*, 142 *N.J.Super.* 274, 277, 361 *A.*2d 104 (App.Div.1976). None of these cases involved whether a juror had a prior criminal record. If a juror who sat on a jury that returned a verdict is unqualified by reason of a criminal conviction, the verdict will be overturned. *State v. Williams*, 190 *N.J.Super.* 111, 462 *A.*2d 182 (App.Div. 1983). The paucity of reported decisions concerning this issue underscores that the potential for harm is small in scope.

The State's application for a remedy to false or inaccurate answers given during voir dire is, on certain levels, appealing. Certainly the Judiciary and all parties want all individuals who speak in court to speak truthfully and accurately: the ACDL–NJ argues "no one can oppose confirming that all proposed jurors are qualified to serve as jurors." Different parties have different reasons to want prospective jurors to be truthful and accurate, however. While the State wants to protect against the seating of jurors who had lied during voir dire concerning their criminal backgrounds, defense counsel might want to protect against the seating of jurors who had lied during voir dire concerning past

victimization or associations with law enforcement. *See State v. Osorio*, 199 *N.J.* 486, 495, 973 *A.*2d 365 (2009). At oral argument, ACLU–NJ argued that the State's application is disingenuous, using the issue of juror qualifications as a pretext to gain a disproportionate advantage in the information war of voir dire.

Significantly, in criminal cases, the seating of jurors who may properly have been challenged for cause can be argued to be disproportionately prejudicial to the State, since the State is unable to appeal. In addition, although decisions like *State v. Williams, supra*, 190 *N.J.Super.* at 117, 462 *A.*2d 182, find that such improper seatings "affect[ ] substantial rights of a defendant and impinge[ ] on the integrity of the trial process," it is not surprising to find the State to be the party concerned when jurors who misstate their prior criminal histories are allowed to serve. The threat that such jurors might lie during voir dire in order to hide their bias toward the State is not entirely fanciful. *See, e.g. Commonwealth v. Cousin, supra*, 873 *N.E.*2d at 745–47.

As the opponents to the State's motion all argue, the court has questionable legal authority to make the distribution requested by the State. The authority to distribute information gathered from juror qualification forms is argued to be limited by court rule and statute when such distribution is requested by a party, and it is further argued to be circumscribed when it is requested for the purpose of verifying juror qualifications. Neither of the prohibitions on distribution argued by the opponents of this motion is decisively established. Nevertheless, the arguments do persuade that distribution of juror information to parties should be conducted with extreme caution. Because of the State's paucity of legal support for making its request, and the deficiency of its application in addressing the legitimate policy concerns raised by its opponents, the court finds *Rule* 1:38–5(g) presents too slim a legal basis on which to base its application for release of juror information to it alone.

*Rule* 1:8–5, allows that, "[t]he list of the general panel of petit jurors shall be made available by the clerk of the court to any

party requesting the same at least 10 days prior to the date fixed for trial." [16] Otherwise, the juror source lists, completed jury questionnaires, and preliminary lists of jurors, "are excluded from public access," *Rule* 1:38-5 and "shall remain confidential . . . unless otherwise ordered by the Assignment Judge." *Rule* 1:38-5(g). Nevertheless, in following the spirit of the rule, this court finds that the jurors' birthdates that are written on the completed juror questionnaires are themselves confidential according to *Rule* 1:38-5. The State seeks to invoke the "unless otherwise ordered by the Assignment Judge" clause of that Rule as the basis for its proposed action.

The Office of the Public Defender and ACLU–NJ argue that, irrespective of *Rule* 1:38-5 vesting power in the assignment judge to order the release of private juror information, it is *Rule* 1:8-5 and *N.J.S.A.* 2B:20-4 that prescribe the permissible information that the Judiciary may release to the parties, and that any deviation from that rule must be made by the legislature. They argue that it is only the list of the petit jurors that may be made available to the parties, as prescribed by *Rule* 1:8-5, and that *N.J.S.A.* 2B:20-4 has limited the information on those lists to "the name and address [17] and, if available, occupation of each juror to be summoned." These sources of law, the briefs argue, implicitly preclude the distribution to parties of other information pertaining to jurors, since parties may access only that information that the rules explicitly allow.

---

[16] Juror source lists in Essex County are prepared pursuant to *N.J.S.A.* 2B:20-2. Jury questionnaires are prepared pursuant to *N.J.S.A.* 2B:20-3, and are required to be completed and returned by *N.J.S.A.* 2B:20-14. Preliminary jury lists are prepared pursuant to *N.J.S.A.* 2B:20-4.

[17] The Public Defender notes that, in an effort to alleviate concerns regarding juror privacy, the Administrative Office of the Courts, by Administrative Directive # 11–82 (May 10, 1983), http://www.judiciary.state.nj.us/directive/vicops/dir_11_82.pdf, has required that the "address" provided under *Rule* 1:8-5 be limited to the name of the juror's municipality, not his or her street address. No one has challenged the power of the Court to issue this Directive. *Cf. In re P.L. 2001, Chapter 362,* 186 *N.J.* 368, 381–84, 895 *A.2d* 1128 (2006).

The ACDL–NJ argues more broadly against the Assignment Judge's legal authority to disseminate the information contained in the prospective jurors' questionnaires, not merely as unauthorized by statute, but as affirmatively disallowed by the State's constitution. It relies upon *In re Supervision & Assignment of the Petit Jury Panels, supra,* 60 *N.J.* at 559–62, 292 *A.*2d 4:

> Article IV, § VII, par. 9, of the 1947 Constitution specifically authorizes the Legislature to pass general laws having to do with "[s]electing, drawing, summoning or empaneling grand or petit jurors," while at the same time forbidding the passage or any private, local or special law directed to this subject.... [T]he mandate of the Constitution reposes in the Supreme Court the responsibility to see that all aspects of jury procedure—so uniquely vital to our system of judicial administration—are preserved, maintained and developed to play their essential part in meting out justice.

The ACDL–NJ also argues the Judiciary should not cede its role in determining juror qualifications to the State, since it is not an impartial participant in the proceedings.

*Rule* 1:38–5(g) clearly gives the Assignment Judge authority to distribute jury questionnaires by order. This court does not find that *Rule* 1:8–5 and *N.J.S.A.* 2B:20–4, by implication, place an absolute limit on that clearly established authority. They do, however, suggest that distribution to parties of information concerning jurors is governed by a scheme apart from *Rule* 1:38–5(g). The ACDL–NJ's point is well taken that *In re Supervision & Assignment of the Petit Jury Panels,* and the constitutional clause on which it rests, would counsel against delegating qualification-verification responsibility to the State, which is itself a party to all criminal cases in the county.

The government's interest in disclosure is extremely limited. For these reasons, this court finds that the balance of interests supports preventing dissemination of prospective jurors' dates of birth in order to protect their privacy interests from government interference.

Even if there were no privacy concerns, the State's proposed practice raises due process issues. Both the Public Defender and the ACLU–NJ argue that a criminal defendant's constitutional right to an impartial jury, *see State v. Williams,* 113 *N.J.* 393, 409,

550 *A*.2d 1172 (1988), precludes the Judiciary from distributing information pertaining to jury selection to only the prosecution. At oral argument, the Public Defender argued forcefully that every piece of information that is given to the State should also be given to counsel for the defendant, as a matter of essential fairness.[18] The State argued against such a system, citing concerns for juror safety, and ironically, some privacy concerns. The State further disagreed with the notion that it should share the full results of its background searches, arguing that privileged and private information should not be shared.

In addition, all of the opponents of the State's motion note the very real possibility of abuse should the State be given the information requested in its motion without sufficient oversight. The ACDL–NJ argues that, if the motion were to be granted, it would be entirely in the State's discretion to decide which jurors to research and for what reasons. This raises the specter of concerns addressed in *Batson v. Kentucky*, 476 *U.S.* 79, 106 *S.Ct.* 1712, 90 *L.Ed.*2d 69 (1986) and *State v. Gilmore*, 103 *N.J.* 508, 511 *A*.2d 1150 (1986), *i.e.* issues of fairness in jury composition. These concerns are legitimate, and the State offered no substantive proposals to alleviate them.

The neutrality of the Judiciary, fundamental notions of fairness, due process protections afforded to criminal defendants, and the potential for abuse in the uneven sharing of information all compel the conclusion that distribution of private juror information to the

---

[18] In fact, a transcript provided by the Public Defender in response to the State raising its concerns about the *Alfaro* trial revealed the existence of a prior "pilot" program conducted by the Judiciary in conjunction with the State and the Sheriff's Office. In this "pilot," started by the prior Assignment Judge and conducted for an unknown period of time, the Judiciary provided dates of birth and the Sheriff's Office and the State ran record checks on all jurors in certain specified cases. It is unknown whether any of the results were shared with defense counsel. This "pilot" program was conducted without the knowledge or consent of the Public Defender.

State, without distributing the same to defense counsel, would be problematic. The State, in its proposal and at oral argument, failed to adequately account for this problematic discrepancy in information made available to the parties.

In sum, *Rule* 1:38–5 does authorize the Assignment Judge to distribute juror questionnaires. However, the *In re Supervision & Assignment of the Petit Jury Panels* decision, *Rule* 1:8–5 and *N.J.S.A.* 2B:20–4, all suggest that such distribution to parties in a case, so that those parties may conduct independent verification of juror qualifications, should be conducted with extreme caution. The State's instant application does not propose a system rooted in deep caution. Instead, the State's application would have the Judiciary provide it with a competitive advantage at trial in at least two ways: by enabling the verification of voir dire answers of unique importance to it, and by providing it alone with the added ability to learn pertinent information about potential and sitting jurors. Although the State has established that a small number of unqualified individuals sitting on juries may be a legitimate public problem, on balance the solution it presents here is fraught with constitutional issues concerning the privacy rights of citizens and the due process rights of defendants. For all of these reasons, and because the legal authority on which its application rests is far too thin for such a problematic proposal, the State's instant application is rejected in its entirety.