NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0930-17T1

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

EDWIN ANDUJAR,

    Defendant-Appellant.

_____

APPROVED FOR PUBLICATION

February 24, 2020

APPELLATE DIVISION

Argued January 15, 2020 – Decided  February 24, 2020

Before Judges Koblitz, Whipple, and Mawla.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment No. 15-05-1096.

John Douard, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; John Douard, of counsel and on the briefs).

Frank J. Ducoat and Emily M. M. Pirro, Special Deputy Attorney Generals/Acting Assistant Prosecutors, argued the cause for respondent (Theodore N. Stephens II, Acting Essex County Prosecutor, attorney; Frank J. Ducoat and Emily M. M. Pirro, of counsel and on the brief).

The opinion of the court was delivered by

WHIPPLE, J.A.D.

Defendant Edwin Andujar appeals from an August 17, 2017 judgment of conviction entered after a jury found him guilty of first-degree purposeful or knowing murder, N.J.S.A. 2C:11-3(a)(1) and (2); fourth-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(d); and third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d). Because the State performed a criminal background check on the one Black juror it unsuccessfully sought to exclude for cause, and the trial court then allowed an unverified municipal warrant to result in the juror's exclusion, we now reverse.

Defendant raises the following issues on appeal.

POINT I

DURING JURY SELECTION, THE PROSECUTOR PERFORMED A RECORD AND WARRANT CHECK ON ONLY ONE PROSPECTIVE JUROR, A YOUNG [BLACK] MAN WHO ACKNOWLEDGED DURING VOIR DIRE THAT HE HAD FRIENDS AND FAMILY WHO HAD CONTACTS WITH THE CRIMINAL JUSTICE SYSTEM, THEREBY VIOLATING THE SPIRIT OF BATSON/GILMORE[1] BY DENYING ANDUJAR HIS RIGHT TO A JURY OF HIS PEERS AND DENYING THE JUROR HIS RIGHT TO SERVE ON THE JURY. MOREOVER, THE PROCEDURE PURSUED BY THE PROSECUTOR, IF PERMITTED, IS LIKELY TO

---

[1]  Batson v. Kentucky, 476 U.S. 79 (1986); State v. Gilmore, 103 N.J. 508 (1986) (adopting Batson framework).

REDUCE JUROR PARTICIPATION FOR FEAR OF REPRISALS BY THE STATE.

POINT II

IMPROPER COMMENTS MADE BY THE PROSECUTOR IN SUMMATION EXCEEDED THE BOUNDS OF PROPRIETY BY INFLAMING AND MISLEADING THE JURY, THEREBY DEPRIVING THE DEFENDANT OF HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL.

POINT III

THE JUDGE DEPRIVED DEFENDANT OF HIS RIGHTS TO PRESENT A DEFENSE, TO DUE PROCESS, AND TO A FAIR TRIAL BY IMPROPERLY PRECLUDING DEFENSE COUNSEL FROM INTRODUCING EVIDENCE THAT [DECEDENT]'S DEATH WAS A RESULT OF HIS PREEXISTING MEDICAL CONDITIONS, AND DELAY IN TRANSPORTING HIM TO THE HOSPITAL; AND FURTHER, BY FAILING TO PROVIDE THE DEFENDANT'S VERSION OF CAUSATION IN THE FINAL JURY CHARGE. U.S. CONST. AMENDS. V, XIV; N.J. CONST. ART.1 PARS.1,10.

> A. After Permitting Evidence That [Decedent]'s Preexisting Medical Conditions Combined With The Delay In Transporting Him To The Hospital For Surgery Were Contributing Factors In Causing His Death, The Judge Barred Defense Counsel From Arguing The Causation Issue In Her Summation.
>
> B. The Judge's Jury Charge On Causation Only Provided The Jury With The State's Theory Of Causation, And Explicitly Told

3

The Jury Not To Consider [Decedent]'s Medical Condition As An Intervening Cause Of His Death.

POINT IV

THE [FORTY-FIVE] YEAR AGGREGATE PRISON TERM, WITH A [THIRTY-EIGHT] YEAR PERIOD OF PAROLE INELIGIBILITY WAS MANIFESTLY EXCESSIVE AND UNDULY PUNITIVE.

Having reviewed all defendant's arguments and the record presented, we determined points two, three and four lack sufficient merit to warrant discussion in a written opinion, Rule 2:11-3(e)(2). Therefore, we concern ourselves here only with the jury selection process and whether defendant was denied his right to a fairly selected jury.

During jury selection, prospective juror F.G.[2] was called to seat number thirteen. F.G. told the court that there was no reason he could not be fair and impartial in this case. He stated that he answered affirmatively to voir dire questions 29, 30, and 31.[3] When asked about question 29, he explained that he

_____

[2] We use the prospective juror's initials to protect his identity.

[3] The relevant portion of the jury questionnaire read:

> 29. Have you or any family member, close friend, or acquaintance ever worked for an agency such as a police department, prosecutor's office, the FBI, DEA, a sheriff's department, jail, prison, the Innocence Project, ACLU, private

had one cousin who worked as a Newark police officer and another cousin who worked as an Irvington police officer. He said he did not discuss their work with them and that nothing about his relationship with them would interfere with his ability to be fair and impartial. When asked who was accused of a crime in regard to question 30, he responded: "A host of people." He also stated "I know a host of people. I got two cousins too,"[4] when asked who the victim was in regard to question 31.

The court called F.G. to sidebar to discuss his responses in more detail. The judge asked F.G. how many people were accused, and F.G. answered: "I know a lot of people." When pressed for numbers, F.G. estimated that five or six close friends were accused and three were victims. The court asked: "[W]ith regard to the way anybody was a victim[,] . . . was accused[, or] was treated by the criminal justice system[, does] that provide any reason for you

---

investigator's office or criminal defense attorney, in N[ew] J[ersey] or elsewhere?

30. Have you, any family member or close friend ever been accused of committing an offense other than a minor motor vehicle offense?

31. Have you, any family member or close friend ever been the victim of a crime, whether it was reported to law enforcement or not?

[4] We do not correct the statements made by F.G.

to say you might not be able to be a fair and impartial juror in this case?" F.G. responded: "No. No." F.G. addressed each of the close friends one at a time.

Regarding the first accused friend, F.G. said the friend had been selling drugs in Newark; he remarked: "I don't know about the case. I just—they get locked up after that it ain't got nothing to do with it." F.G. did not know whether the friend pled guilty or had been tried, but he said he believed the friend had been treated fairly by the justice system. As to his relationship with this friend, F.G. said: "I went to high school with him, told him to come by my mother's, hey, what is up, keep it moving." He said he had not seen the friend since he was arrested.

F.G. stated that a second friend was also arrested for selling a controlled dangerous substance (CDS). He did not know what happened with him, but he assumed it was the same as with his first friend. He said he had no impression concerning whether the second friend was treated fairly by the judicial system: "Honestly, I don't have any problem as long as I stay out of it." He also did not know whether the second friend was tried or pled guilty. F.G. stated that he believed the third friend was arrested for selling drugs at the same time as the second friend and that the third friend was home, so he assumed he had been treated fairly. When asked if these friends had been prosecuted by the

6

Essex County Prosecutor's Office, F.G. explained that he did not know because he did not "get into their business" and did not go to their court cases.

F.G. recalled that a fourth friend was charged with gun possession about seven years earlier. He had no impression of whether the friend had been treated fairly and they never talked about his case. He said "I don't know if he pleaded guilty. All I know he got trigger locked and he went away." He explained "trigger locked" meant that the friend had three gun charges against him, and "after the third one he went to the feds." When asked how he knew about "trigger locked," he said "I grew up in a neighborhood where it just ain't good. You learn a lot of things from the streets."

F.G. could not think of anyone else who had been charged with a crime. Regarding the victims, he stated that he had two cousins who were murdered. One was stabbed in Newark fifteen years earlier, and the person arrested and tried for the murder was acquitted. He stated he was upset the individual was not convicted but he mostly stayed away from the whole situation. The other cousin was shot in Kentucky thirteen years earlier and the perpetrator was convicted and sent to prison. F.G. also recalled that a friend of his was robbed two years earlier and no one was apprehended for the crime. When asked what he thought about that, he stated "[a] lot of my friends live that lifestyle, so I think it just come with the territory."

When the court asked if F.G. thought the fact that he knew people who were accused of crimes and who were the victims of crimes would make him a better juror than someone without those life experiences, F.G. said: "No" and that he would view the evidence "the same as anybody else, background would affect them." When asked for an explanation, he stated:

> What I was saying was, like, everybody in here, jurors and everybody, got a background. And, you know, this is different, that is why you getting judged by what [fourteen], [thirteen], and everybody got different perspectives about everything.
>
> So, you know, what I'm saying, mine's might be a little different than the next person. The next person's might be a little different according to where they grew up and how they grew up.

With regard to his background specifically and the "lifestyle" he referenced, F.G. explained "a lot of friends I grew up in neighborhood, they hustle, they selling drugs; that is what I meant by the lifestyle."

F.G. went over his answers to the remainder of the jury questionnaire. He stated that he graduated from high school and attended some college classes. He worked for a municipal Department of Public Works, and in his spare time he coached youth football. He said he believed that the criminal justice system is fair because you are judged by your peers.

After F.G. was sent back to his seat, the prosecutor requested that the court remove him for cause because

[h]e has an awful lot of background. He says that he wants no parts of any of this, but he has a host, using his own language, of friends and family that have been accused of crimes, same as being victims.

But when asked to give a number, he just kind of guessed at the number, [j]udge, he gave us a number that would satisfy us, the State submits. And I just felt that there [are] more people that he knows are accused and even more that could be victims. I think on a case like this he has had two cousins that were murdered, one was involved in a stabbing and a domestic dispute. It sort of mirrors the facts of this case. It is a risk to take a chance on somebody that might have a, you know, problem with his cousin getting murdered in a domestic dispute when we have the same set of facts in this case almost mirroring it.

You know, he has–he uses all of the lingo about, you know, the criminal justice system, talked about people getting picked up, talked about people getting trigger locked, talked about CDS, talks about the lifestyle. I just think that given his background and his extensive background in the criminal justice system with friends and family and knowing what the testimony in this case is going to be is problematic. And I think the juror should be excused for cause based on his answers to those questions.

In addition, a second assistant prosecutor added the following reasons:

What I think is very concerning his close friends hustle, engaged in criminal activity. That is how his friends make a living. That draws into question whether he respects the criminal justice system, whether he respects what his role is here, and whether he is going to uphold all of the principles that he was instructed by your [h]onor.

Additionally, I don't think that he was as forthcoming about his knowledge of the system. I know towards the end after probing by counsel and by your [h]onor, he did admit he knew a term such as "trigger locking" and the way things worked. But in the beginning he seemed to just not be forthcoming, no, I don't really know, I know they are locked up, I don't hear anything. I don't think he was being fully honest.

Defense counsel opposed the application, arguing that "the State's position is untenable in the sense that it means that no Black man in Newark would be able to sit on this jury." The court stated he understood defense counsel's point and denied the request, stating:

I don't think there has been any reason at all that this juror should be excused for cause.

. . . .

Everything he said and the way he said it leaves no doubt in my mind that he's not expressed or does not have any bias towards the State nor the defense for anything. What he said, how he said it. I think he would make a fair and impartial juror. I don't have any reason to doubt it, so that application is denied.

After the juror was seated, the assistant prosecutor conducted a criminal record check on F.G. The next day, the judge revealed on the record that the prosecutor came to see him in chambers the previous afternoon to talk about F.G.:

[The prosecutor] said basically that the man had been arrested before. He had warrants out for him. They

10

were going to lock him up. And then they gave me some papers, I guess, corroborating what they were saying, which was incident reports and some printouts.

. . . .

One warrant out of Newark Municipal Court. My question is simple. What application of relief does either side have because the court only responds to application[s] of relief.

The prosecutor renewed her application to have F.G. removed for cause. Defense counsel initially did not oppose the State's application but requested that F.G. be arrested out of the presence of the jury pool. The court and the prosecutor agreed that the arrest would be executed elsewhere in the courthouse.

Later, the court asked the sheriff's officer to look outside to see if F.G. was there. The officer confirmed F.G.'s presence and the prosecutor made a phone call to determine the best way to isolate him from the other prospective jurors. At that point, defense counsel expressed concern that arresting F.G. would taint the entire jury and asserted: "I think coming to court for jury service no one expects they are going to be looked up to see if they have warrants." The court suggested a plan whereby all prospective jurors would be seated and then F.G. would be excused with directions to report to the first floor. "And when he walks out of this courtroom, it will not be to the first floor he returns. It will be into the grasp of your law enforcement officer."

11

The prosecutor agreed to this plan and added that the State was not in the habit of looking at random jurors' criminal histories. She asserted the check was conducted because of F.G.'s acknowledgement that he associated with people who "hustle drugs," and the court's refusal to excuse him for cause. Her research revealed that F.G. had an open municipal warrant as well as two arrests in the past "both for domestic violence where it seems he has an alleged habit of beating up women." The prosecutor also rejected defense counsel's assertion that her motion to remove F.G. for cause was based on racial bias. In making these statements, the prosecutor referred to a meeting in chambers, that is not transcribed or otherwise contained in the record, in which defense counsel accused her of moving against F.G. because of racial bias.

An argument ensued between the attorneys, which the court cut short stating:

> I'm stopping this. . . . Nobody asked this court for any relief. The only thing that I know is the prosecutor, based on new information, made an application, applied to excuse the juror for cause. Defense counsel did not disagree or consent[] to it. So they were excused for cause. That is the only [horse] the court had in the race.

The court took a short break, after which defense counsel said that she had the opportunity to speak with her office and she withdrew her consent to the dismissal of F.G. for cause. She requested as a remedy for the State's

12

action that defendant be awarded an additional peremptory challenge. The court reserved on the application and directed counsel to try to reach a compromise on the matter.

The court then called in the jury pool, and informed F.G. that he was excused and that he should report to the first floor. F.G. left, after wishing that the court "[h]ave a nice day." He was arrested immediately thereafter once officers checked to make sure the hallway was clear of potential jurors.

Counsel were unable to reach an agreement on the remedy for F.G.'s dismissal for cause and continued to argue as to whether the State's action was legally supportable. The prosecutor contended that it did not matter because F.G. was under arrest and unavailable for jury duty. She also claimed that F.G. had been dishonest in his answers to the court's questions, to which defense counsel replied that there was no evidence that F.G. knew that he had accusations against him. The court found that there was no reason to grant the relief defense counsel was seeking and the court formally denied defendant's application for an extra peremptory challenge.

Additional voir dire ensued, after which all counsels stated that they were satisfied with the jury as seated. At that point, the State had one peremptory challenge remaining, and defendant had two.

On appeal, defendant argues the implicit bias in the prosecutor's procedure renders the procedure constitutionally suspect because it violates the underlying constitutional principles that protect both defendant and potential jurors from discriminatory jury selection processes. Defendant argues that the prosecutor's selective use of a background check, on a Black juror, as a means of making the juror unavailable, impermissibly allowed the State to circumvent a Batson v. Kentucky, 476 U.S. 79 (1986) determination. We agree.

I

We are confronted with the following questions: (1) whether the prosecutor improperly utilized a criminal record check to selectively investigate a single minority member of the jury; and (2) whether the Batson framework is applicable to situations where a prosecutor has the prospective juror arrested, based on that selective criminal record check, after a court decides the juror should not be dismissed for cause and a Batson question has been raised. Before reaching the underlying merits of this claim, we must first address the State's contention that defendant waived the right to challenge the jury composition on appeal.

There is no question that "[t]he jurisdiction of appellate courts rightly is bounded by the proofs and objections critically explored on the record before the trial court by the parties themselves." State v. Robinson, 200 N.J. 1, 19

(2009). The trial court must be alerted to the "basic problem" and have the opportunity to consciously rule upon it before the issue may be raised for appellate review. Ibid. (citations and internal quotation omitted); see also State v. Witt, 223 N.J. 409, 419 (2015) (noting our appellate courts will decline to consider issues not properly presented to trial court when opportunity for such presentation is available). The New Jersey Supreme Court observed:

> [I]f late-blooming issues were allowed to be raised for the first time on appeal, this would be an incentive for game-playing by counsel, for acquiescing through silence when risky rulings are made, and, when they can no longer be corrected at the trial level, unveiling them as new weapons on appeal.
>
> [Robinson, 200 N.J. at 19 (quoting Frank M. Coffin, On Appeal: Courts, Lawyering, and Judging 84-85 (W.W. Norton & Co. 1994)).]

The law as stated in Robinson, and Witt, does not bar defendant from challenging F.G.'s dismissal. This issue was clearly raised by defense counsel at trial. Virtually the first action taken by defense counsel, when she heard the State's motion to dismiss F.G., was to object to the prosecutor's use of a record check to exclude an urban Black man from the jury. Thus, the charge of racial profiling in the selective performance of record checks was plainly in front of the trial court. Additionally, the court heard argument on issues surrounding F.G. and had ample opportunity to rule upon them. The court made no formal

15

ruling, however, because it recognized what defendant raises in his response to the State's argument; once F.G. was arrested by the State, the court had no choice but to excuse him for cause, since he was rendered unavailable by his arrest. Likewise, once F.G. was arrested, there was no point in defense counsel continuing to argue that he should be seated on the jury.

The situation here is analogous to what occurs in a <u>Batson</u> challenge. The procedure that is followed when a defendant claims bias in the prosecution's exercise of peremptory challenges requires that the defendant raise a timely objection during or at the end of jury selection. <u>State v. Gilmore</u>, 103 N.J. 508, 535 (1986). The defendant is not deprived of an appeal if his objection is overruled and the matter proceeds to trial before a jury to which he ultimately assents. Similarly, here, defense counsel made known her objection to the prosecutor's performance of a criminal record check on F.G., her lack of consent to the for-cause dismissal of F.G., and her desire for some sort of remedy. For these reasons, it would be fundamentally unfair to deprive defendant of the right to appeal the actions of the prosecutor, and the rulings of the court in declining to grant defendant any remedy.

II

We now turn to the question of whether the prosecutor improperly utilized the criminal record check in selectively investigating a single minority

16

member of the jury. The only case in New Jersey that has considered the propriety of a prosecutor conducting criminal background checks on prospective jurors is In re State ex rel. Essex Cty. Prosecutor's Office, 427 N.J. Super. 1 (Law Div. 2012). There, Assignment Judge Patricia Costello denied the State's request that the "court order the jury manager to turn over the dates of birth of certain persons in the petit jury pool to the State to facilitate running criminal background checks on those potential jurors." Id. at 4, 26.

In analyzing the State's request, Judge Costello reviewed the evolution of voir dire questioning of potential jurors in New Jersey. Id. at 6-13. She noted that New Jersey laws concerning questioning of potential jurors originated from the English common law tradition in which examination was only allowed after a litigant posed a challenge for cause, supported by extrinsic evidence. Id. at 7. Through a progression of Supreme Court decisions, legislation, court rule changes, and administrative directives, the modern practice developed in which the responsibility for voir dire questioning was placed in the hands of the trial judge, who could question jurors "only according to limited prescribed guidelines and almost never under oath." Id. at 6-13.

The judge observed that "the action proposed here by the State would represent a next step in a progression from a system in which jurors are

implicitly trusted to one in which their disinterest and qualifications to sit on a case are verified by pre-trial investigation." Id. at 13-14. The judge cautioned that such a next step would represent an "acute departure" from the practice currently established where the Judiciary bears the responsibility of inquiring into the qualification of potential jurors. Id. at 14.

The State contended that confirming whether jurors are qualified to serve falls under the enforcement power granted to a county prosecutor by N.J.S.A. 2A:158-5. Id. at 15. Further, it argued that the Administrative Code, N.J.A.C. 13:59-2.1, allows criminal justice agencies to access criminal history record information. Ibid. Judge Costello recognized the authority granted to the prosecutor by these provisions but noted that "[n]owhere . . . does it state that the court is obligated to provide other criminal justice agencies with information they require in order to facilitate criminal background checks." Ibid.

Judge Costello specifically noted that "[t]he issue of whether N.J.A.C. 13:59-1 to -2.4 actually authorizes the State to conduct criminal background checks on potential jurors is not before the court in this application." Id. at 19 n.15. Rather, her holding addressed only the court's obligation to turn over potential jurors' birthdates to the prosecution. In finding that such information was privileged, the judge relied on the jurors' reasonable expectation of

privacy in the information they provided in their juror qualification forms. Id. at 18-19. She concluded:

> If the Judiciary is to disseminate the personal information it collects from administering the county's jury-related functions, it must first and foremost be convinced that there is a genuine need that can in some way be addressed by that dissemination. Here, although the State's brief demonstrates that unqualified individuals' service as jurors can be a legitimate public problem, it does not demonstrate that it has been so in New Jersey, or that this problem is sufficiently serious as to merit the solution it proposes. Its proposed relief would not merely serve the neutral concerns of ensuring the efficiency and validity of court proceedings, but would instead in large part serve to benefit the State's own interests at the expense of criminal defendants.
>
> [Id. at 20.]

Under Rule 1:8-5, the clerk of the court must provide any requesting party a list of the general panel of petit jurors at least ten days prior to the date of trial. Id. at 22-23. Also provided under Rule 1:8-5 is each juror's municipality, but not his or her street address. Id. at 23 n.17. Judge Costello ruled the assignment judge lacked both statutory and constitutional authority to disseminate any other identifying information contained in prospective jurors' questionnaires. Id. at 24.

In dicta, she commented:

> [A]ll of the opponents of the State's motion note the very real possibility of abuse should the State be given

19

the information requested in its motion without sufficient oversight. The ACDL-NJ[5] argues that, if the motion were to be granted, it would be entirely in the State's discretion to decide which jurors to research and for what reasons. This raises the specter of concerns addressed in <u>Batson</u> . . . and . . . <u>Gilmore</u> . . . <u>i.e.</u> issues of fairness in jury composition. These concerns are legitimate, and the State offered no substantive proposals to alleviate them.

[<u>Id.</u> at 25.]

Like in <u>Essex County</u>, the question of whether New Jersey laws authorize the State generally to conduct criminal background checks on potential jurors is not before us. The New Jersey Administrative Code addresses when prosecutors can run criminal record checks. N.J.A.C. 13:59-2.1(a) provides:

> Criminal justice agencies, <u>for purposes of the administration of criminal justice</u>, may obtain from the SBI[6] or otherwise access information collected by criminal justice agencies concerning persons and stored in the central repository of the New Jersey State Police SBI, the National Crime Information Center . . . or other states' computerized repositories containing criminal history record information.
>
> [(Emphasis added).]

N.J.A.C. 13:59-2.4(b), provides:

---

[5]  Association of Criminal Defense Lawyers of New Jersey.

[6]  N.J.A.C. 13:59-1.1 defines "SBI" as "the State Bureau of Identification created by N.J.S.A. 53:1-12 as a bureau within the Division of State Police."

The [SBI] shall prominently display the following on any record disseminated for criminal justice purposes.

Use of this record is governed by Federal and state statutes and regulations. <u>Unless fingerprints accompanied your inquiry, the [SBI] cannot guarantee this record relates to the person who is the subject of your request.</u> Use of this record shall be limited solely to the authorized criminal justice purpose for which it was given and it shall not be further disseminated for any other purpose. . . .

A person is presumed innocent of any charges or arrests for which there are no final dispositions indicated on the record. This record is certified as a true copy of the criminal history record information on file for the assigned SBI number.

[(Emphasis added).]

We question whether performing a criminal record check for the purpose of disqualifying a juror at trial supports "the administration of justice." Additionally, the prosecutor performed the check on F.G. based on his name, which the State claims was "sufficiently unique." It offered no proof of that claim. Without a fingerprint, social security number, birthdate, or even a street address, there was no way to be sure the records the State obtained pertained to F.G., who had reported to the courtroom for jury duty. The regulation itself warns that without fingerprints the SBI cannot guarantee that the record relates to the subject of the request.

The municipal warrant that the State uncovered is not part of the record on appeal. Nor is there any documentation to support the prosecutor's assertion that F.G. "beat women." We emphasize New Jersey does not bar people from juries because they have been arrested, nor do we bar people who have municipal warrants or convictions for traffic violations, juvenile offenses or other non-indictable offenses. New Jersey requires that jurors "shall not have been convicted of any indictable offense under the laws of this [s]tate, another state, or the United States." N.J.S.A. 2B:20-1(e).

It is unknown if there were domestic violence accusations against F.G., and if so whether they arose from police incident reports, proceedings in the family court, or criminal charges. Further, the nature of the municipal warrant is unknown. If it was the result of unpaid traffic violations, then F.G. may not have been intentionally lying when he said he had never been accused of an offense other than a minor motor vehicle offense.[7]

---

[7] According to the Report of the Supreme Court Working Group on the Municipal Courts dated July 8, 2019, the Supreme Court Committee was charged with conducting a reform-minded review of Municipal Court practices, particularly those that can have a detrimental effect on individuals with lesser means. Report of the Supreme Court Working Group on the Municipal Courts 1 (July 8, 2019). One of the initiatives realized was the development of a multi-pronged approach to ensure that bench warrants are issued only when they may be useful and necessary. Id. at 4. Consistent with that end, in January 2019, the Chief Justice signed an order on behalf of the Supreme Court dismissing over three quarters of a million minor Municipal

Although we do not reach the question of whether a criminal record check is authorized during jury voir dire, a more complete record should have been made before the court granted the prosecutor's request to dismiss F.G. for cause. F.G. was a seated juror under the court's control, and therefore, the State should not have undertaken such measures that would render a seated juror unavailable without leave of court. The results of the criminal background check should have been read into the record. All arguments on the matter should have been transcribed rather than conducted off the record in chambers. Most importantly, because it is the judge's role to preside over the trial and promote respect for the process, the judge should have questioned F.G.—out of the presence of other prospective jurors—about the results of the record check. F.G. would thus have had the opportunity to confirm whether he was the actual subject of the record check and whether he was aware that a municipal warrant had been issued against him.

III

---

Court matters that were at least fifteen years old due to questions of fairness, the use of public resources and the ability of the State to prosecute them. New Jersey Courts, Supreme Court Dismisses Old Municipal Court Warrants in Minor Matters (Jan. 17, 2019), https://njcourts.gov/pressrel/2019/pr011719a.pdf. We do not know if the municipal warrant in this matter would have fallen into that category.

Recognizing a more complete record should have been made, we now turn to the facts of the instant case to determine whether the prosecutor's selective investigation, on a single minority member of the jury, and the consequences which stemmed therefrom are permissible under a Batson/Gilmore analysis.

Defendant asserts that the portions of F.G.'s voir dire that the State calls suspicious represent experiences that many young, urban minorities share. Defendant argues the prosecutor's suspicion that a record check would turn up grounds for excluding F.G. from the jury was the result of the implicit bias inherent in many aspects of the criminal justice system. For that reason, and in light of the law established by Batson, 476 U.S. at 84, Gilmore, 103 N.J. at 523, and State v. Osorio, 199 N.J. 486, 492-93 (2009), defendant urges the court to reverse his conviction and remand the matter for a new trial.

The State argues the prosecutor's conduct was not based on bias and was supported by F.G.'s answers to voir dire questions. It maintains that under a Batson/Gilmore analysis, "defendant could not have shown even a prima facie case of discrimination in the prosecutor's checking of prospective jurors' backgrounds".

The United States Supreme Court has long recognized that the Constitution forbids striking even a single juror for a discriminatory purpose.

See Foster v. Chatman, 136 S. Ct. 1737 (2016). Indeed, the Court has made clear that racial discrimination in the selection of a jury violates a defendant's right to equal protection of the law, unconstitutionally excludes an individual from jury service, and harms the entire community by undermining public confidence in the fairness of our judicial system. Batson, 476 U.S. at 86-87. "Discrimination within the judicial system is most pernicious because it is 'a stimulant to that race prejudice which is an impediment to securing to [Black citizens] that equal justice which the law aims to secure to all others.'" Id. at 87-88 (quoting Strauder v. West Virginia, 100 U.S. 303, 308 (1880)).

In Batson, 476 U.S. at 96-98, the Court recognized that the Equal Protection Clause of the United States Constitution prohibits the use of peremptory challenges to exclude jurors on account of their race and provided a three-step framework to determine when the challenges are improperly used. First, the opponent of the peremptory challenge must "make a prima facie showing that [the] challenge has been exercised on the basis of race." State v. Thompson, 224 N.J. 324, 339 (2016) (discussing the Batson framework). "Once this burden has been met, the prosecutor 'must offer a race-neutral basis for striking the juror in question.'" Ibid. (citation omitted). Lastly, the trial judge is tasked with determining whether the opponent proved intentional discrimination. Ibid.

Utilizing the Batson framework, the Court in Hernandez v. New York, 500 U.S. 352, 359-60 (1991), instructed that when addressing the question of whether a peremptory challenge violates the Equal Protection Clause, courts "must keep in mind the fundamental principle that 'official action will not be held unconstitutional solely because it results in a racially disproportionate impact. . . . Proof of racially discriminatory intent or purpose is required to show a violation. . . .'" In that case, the defendant objected to the State's use of its peremptory challenges to exclude Latino potential jurors. Id. at 355-56. The State asserted its basis for striking the jurors in question was based on its uncertainty that the bi-lingual jurors would be able to listen and follow the interpreter. Id. at 356. The Court found that disparate impact is not conclusive in the preliminary race-neutrality step of Batson, as an argument relating to the impact of a classification does not alone show its purpose. Id. at 361-63.

Instead, the Court noted disparate impact is germane to the trial court's consideration of whether purposeful discrimination existed. Id. at 363. The Court added "'[a]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the [classification] bears more heavily on one race than another.'" Ibid. (alteration in original) (citation omitted). Stated differently, the Court instructed that a

trial court may consider the fact that a prosecutor's peremptory challenge results in the disproportionate exclusion of members of a certain race in determining whether the State's reason constitutes a pretext for racial discrimination. Id. at 363-64.

Recently, in Flowers v. Mississippi, 139 S. Ct. 2228, 2251 (2019), the Court emphasized the importance of assessing all the relevant facts and circumstances when determining whether a peremptory strike was motivated in substantial part by discriminatory intent. In that case, a Black male defendant was tried six separate times for the murder of four employees of a Mississippi store, three of whom were White. Id. at 2234, 2236. There, the Court assessed the relevant history of the first four trials and concluded the history of the case strongly supported that the State's use of peremptory strikes, in the sixth trial, was motived in substantial part by discriminatory intent. Id. at 2245-46. The Court noted:

> Stretching across [defendant]'s first four trials, the State employed its peremptory strikes to remove as many [B]lack prospective jurors as possible. The State appeared to proceed as if Batson had never been decided. The State's relentless, determined effort to rid the jury of [B]lack individuals strongly suggests that the State wanted to try [defendant] before a jury with as few [B]lack jurors as possible, and ideally before an all-[W]hite jury.

> [Id. at 2246.]

27

The Court stated that four critical facts, taken together, warranted reversal: (1) the State utilized its peremptory challenges, in the six trials combined, to strike forty-one of the forty-two Black prospective jurors; (2) in the sixth trial the State used its peremptory strikes on five of the six Black prospective jurors; (3) "at the sixth trial, in an apparent effort to find pretextual reasons to strike [B]lack prospective jurors, the State engaged in dramatically disparate questioning of [B]lack and [W]hite prospective jurors;" and (4) "the State then struck at least one [B]lack prospective juror . . . who was similarly situated to [W]hite prospective jurors. . . ." Id. at 2235.

Although the Court declined to decide whether any of those four facts alone would require reversal, id. at 2235, it stated that disparate questioning, along with other evidence, may inform the trial court's evaluation as to whether discrimination occurred, id. at 2248. The Court noted:

> [T]his Court's cases explain that disparate questioning and investigation of prospective jurors on the basis of race can arm a prosecutor with seemingly race-neutral reasons to strike the prospective jurors of a particular race. . . . [A] prosecutor can try to find some pretextual reason–any reason–that the prosecutor can later articulate to justify what is in reality a racially motivated strike. And by . . . not asking [W]hite prospective jurors those same questions, the prosecutor can try to distort the record so as to thereby avoid being accused of treating [B]lack and [W]hite jurors differently. Disparity in questioning and investigation can produce a record that says little about [W]hite prospective jurors and is therefore

28

resistant to characteristic-by-characteristic comparisons of struck [B]lack prospective jurors and seated [W]hite jurors. . . . A court confronting that kind of pattern cannot ignore it. The lopsidedness of the prosecutor's questioning and inquiry can itself be evidence of the prosecutor's objective as much as it is of the actual qualifications of the [B]lack and [W]hite prospective jurors who are struck or seated. . . .

[Id. at 2247-48.]

After Batson, our Supreme Court, in Gilmore, 103 N.J. at 524, "determined that the provisions of the New Jersey Constitution, Article I, Paragraphs five, nine, and ten, likewise prohibited a prosecutor from exercising peremptory challenges on the basis of religious principles, race, color, ancestry, national origin, or sex." Thompson, 224 N.J. at 340. There, the Court explained the main point of drawing a jury from a representative cross-section of the community is "to achieve an overall impartiality by allowing the interaction of the diverse beliefs and values the jurors bring from their group experiences. . . ." Gilmore, 103 N.J. at 525 (quoting People v. Wheeler, 583 P.2d 748, 761 (Cal. 1978)). The three-step Batson/Gilmore methodology was refined slightly in Osorio, 199 N.J. at 492-93, where the Court explained the requirements of each stage of the process.

For the first step, the Court clarified that the burden of establishing a prima facie case is not intended to be onerous and will be satisfied if the defendant produces sufficient evidence to draw an inference that

discrimination has occurred. Id. at 501-02. Once a prima facie case is established, the second step shifts the burden to the prosecution to articulate a clear and reasonably specific explanation justifying its action. Id. at 504. The Osorio court cautioned that in deciding whether the prosecutor has successfully rebutted the inference, "the trial court must be sensitive to the possibility that 'hunches,' 'gut reactions,' and 'seat of the pants instincts' may be colloquial euphemisms for the very prejudice that constitutes impermissible presumed group bias or invidious discrimination." Id. at 505 (quoting Gilmore, 103 N.J. at 539).

The third step requires the trial court to judge the defendant's prima facie case against the prosecution's rebuttal to determine whether the defendant has carried the ultimate burden of proving, by a preponderance of the evidence, that the prosecution's actions were exercised on grounds of presumed group bias. Id. at 506. The Osorio Court cited approvingly State v. Clark, 316 N.J. Super. 462, 473-74 (App. Div. 1998), as setting forth the factors the trial court should consider when engaging in such an analysis. 199 N.J. at 506-07. These factors include whether the prosecution has applied the reasons proffered for its actions evenhandedly to all prospective jurors, the overall pattern of the prosecution's actions, and the composition of the jury ultimately selected to try the case. Ibid.

Here, it is important to note the trial judge, having listened to the arguments of two assistant prosecutors, rejected their application, finding that there was no reason at all to excuse F.G. for cause. He based his decision not only on what F.G. said but also on the way he said it. Such a credibility determination lies well within the considerable discretion afforded the court in such matters. See State v. Locurto, 157 N.J. 463, 473 (1999).

Despite the trial court's finding, the prosecutor elected to conduct a criminal record check on F.G. and stated, in support of her second motion for a for-cause dismissal, her reasons for performing the check. The prosecutor asserted:

> [T]he State is not in the habit of doing what counsel just suggested where we are looking at a random juror's [criminal record]. [F.G.'s] background and his acknowledgment that he hangs out with people that are in a lifestyle and hustling drugs and getting arrested, the dozens of criminal elements that he produced here at sidebar raised the concern for the State. Where I asked for him to be excused for cause, he was not.

The prosecutor also informed the court that the record check revealed that F.G. had an outstanding municipal warrant, and that the State was going to have him arrested. Defense counsel argued that because F.G. was selectively targeted for a background check, constitutional concerns such as a person's right to sit on a jury were implicated. Nevertheless, F.G. was arrested,

31

therefore making him unavailable, and the defense was awarded no remedy. The trial court should have engaged in a <u>Batson</u>/<u>Gilmore</u> analysis.

We acknowledge that many of the considerations used to determine whether a defendant satisfied the standard for a prima facie <u>Batson</u>/<u>Gilmore</u> challenge are uniquely geared to the peremptory challenge process and do not translate well to the performance of criminal background checks. For example, both <u>Osorio</u> and <u>Gilmore</u> listed as an important consideration whether the prosecutor "struck most or all of the members of the identified group from the venire." <u>Osorio</u>, 199 N.J. at 503 (quoting <u>Gilmore</u> 103 N.J. at 536). Here, the challenged action was the prosecutor's performance of only one background check, the subject of which was a member of the identified group. Most of the <u>Osorio</u> factors concern common traits of the stricken jurors and patterns of the prosecution's use of peremptory challenges. <u>Ibid.</u> Such group characteristics may not be discerned from a single, selective performance of a record check.

Nevertheless, we reject the State's argument that defendant could not have made a colorable argument for even a prima facie case of discrimination. As the Supreme Court of the United States instructed in <u>Flowers</u>, disparate investigation of prospective jurors based on race, along with other evidence, may inform the trial court's evaluation as to whether discrimination occurred.

<span>A-0930-17T1</span>

F.G. was a member of a protected group, and no member of a non-protected group was subjected to a record check. It is not difficult to surmise that running criminal background checks only on minority jurors could result in a majority jury.

Additionally, as noted in Hernandez, defendant's contention that portions of F.G.'s voir dire which the State called suspicious represent experiences that are more common to minorities than non-minorities, if true, is also germane to the trial court's determination as to whether discriminatory intent exists, as discriminatory purpose may often be inferred where classifications bear more heavily on one race than another. Moreover, the prosecutor's proffered explanation for performing the record check was very much like the sort of speculation against which Osorio cautioned. The prosecutor presented no characteristic personal to F.G. that caused concern, but instead argued essentially that because he grew up and lived in a neighborhood where he was exposed to criminal behavior, he must have done something wrong himself or must lack respect for the criminal justice system. This is not a new argument; Black jurors have historically faced the attribution they will show leniency toward defendants and are indifferent to criminality. See Thomas Ward Frampton, The Jim Crow Jury, 71 Vanderbilt Law Review, 1593, 1603 (2018).

Such reasoning may have arisen from the sort of prejudice that constitutes impermissible presumed group bias.

In the end, we cannot determine with certainty whether the prosecutor applied her reasons evenhandedly to all prospective jurors, because we do not know: whether any other venire members responded affirmatively to questions about the involvement of friends or family members with the criminal justice system; if any other venire members grew up or lived in the same area of Newark as F.G.; or the racial composition of the jury that convicted defendant.

The State's argument that even if the record check was performed improperly, there was no relief available to rectify the matter ignores the remedies available to a trial court to address Batson/Gilmore violations. The court could have dismissed the empaneled jury members and begun jury selection anew; it could have ordered the prosecutor to forfeit her remaining peremptory challenges; or it could have granted additional peremptory challenges to the defense. State v. Andrews, 216 N.J. 271, 293 (2013). The court should have allowed F.G. to explain the alleged municipal warrant, and if satisfied by his responses, the judge could have refused to grant a dismissal for cause even in the face of the juror's potential arrest. We do not presume that arrest on a municipal warrant would have made F.G. unavailable for trial.

In order to secure a defendant's right to a jury as guaranteed by the United States and New Jersey constitutions, we compel citizens by summons to come to the courthouse to be considered as potential jurors. For most, this is a disruption of their work and family lives. We ask them to disclose personal, often uncomfortable information. The compulsion to appear should not include the threat of arrest if we seek to convincingly assure the citizenry that jury service is an honor and a duty. Record checks run because of dissatisfaction with a judge's ruling, as was done here, undermine the framework within which the trial proceeds and alters the court's exclusive province in administration of the jury venire. Because the court made no findings of fact concerning the prosecution's selective use of a criminal record check and granted no relief to the defense whatsoever, defendant's conviction must be reversed, his sentence vacated, and the matter remanded for a new trial.

Reversed. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION